20-1581, 21-1857, 22-1733, 23-1509

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

### SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

**v.**

### NAVELLIER & ASSOCIATES, INC.; LOUIS NAVELLIER,

Defendants-Appellants.

---

On Review of Orders of the United States
District Court for the District of Massachusetts, 1:17-cv-11633-DJC

---

### BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---

MEGAN BARBERO
General Counsel

DANIEL STAROSELSKY
Assistant General Counsel

PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... v

COUNTERSTATEMENT OF JURISDICTION .................................................. 1

COUNTERSTATEMENTS OF THE ISSUES PRESENTED .................................... 3

COUNTERSTATEMENT OF THE CASE .................................................... 5

    A.    Statutory and Regulatory Background .......................................... 5

    B.    Factual Background ........................................................... 7

        1.    Navellier, NAI, and NAI's Leadership ............................... 7

        2.    Commission staff warned appellants three times to stop making misleading claims about the performance of investment products. ......................................... 8

        3.    Appellants misleadingly recommended an investment strategy based on a performance history that they knew was not verifiable. ......................... 8

        4.    Appellants recognized that the performance history of the strategy they recommended was "pure FRAUD," but they continued selling it to clients and never told clients the truth. ................................................ 11

        5.    Appellants sold the Vireo business to F-Squared to maximize their own gains and avoid liability. .................. 15

    C.    Procedural Background ..................................................... 18

        1.    The Commission filed a complaint against appellants, and the court allowed the Commission's motion for partial summary judgment on liability ............................. 18

# TABLE OF CONTENTS (continued)          Page

2.     The court imposed permanent injunctions, civil penalties, and disgorgement on appellants. ......................21

3.     The court issued post-judgment orders.............................23

STANDARD OF REVIEW ..........................................................................23

SUMMARY OF THE ARGUMENT ...............................................................24

ARGUMENT ...........................................................................................27

I.     The court properly concluded that the Commission was entitled to summary judgment against Navellier and NAI................................27

    A.     The court correctly held that appellants defrauded their clients..................................................................................28

       1.     Appellants repeatedly breached their fiduciary duty to clients....................................................................28

       2.     Appellants' fraud was material. ........................................31

       3.     Appellants acted with scienter...........................................34

    B.     The court acted within its discretion in admitting and considering the communications between NAI and ACA Compliance Group.................................................................40

II.     The court acted within its discretion in ordering remedies. ...............42

    A.     The court acted within its discretion in ordering appellants jointly and severally to disgorge their ill-gotten gains..............42

       1.     The court properly ordered disgorgement to deprive appellants of their ill-gotten gains.....................................42

       2.     The court reasonably calculated appellants' ill-gotten gains. ....................................................................51

iii

# TABLE OF CONTENTS (continued)                    Page

3.      The court reasonably held Navellier and NAI jointly-and-severally liable for disgorgement. ...............................56

B.      Appellants' remaining remedies challenges fail. .......................57

III.    The court correctly rejected appellants' affirmative defense that the Commission selectively enforced this case against them. .............59

A.      Selective Enforcement........................................................59

1.      Appellants have not shown that they were selectively treated....................................................60

2.      Appellants' have not shown that the Commission brought this action against them in bad faith....................61

B.      Class-of-One .................................................................65

IV.     Appellants' post-judgment challenges lack merit. ................................67

A.      Reconsideration Motions (Appeals 20-1581 and 22-1733) .........67

B.      Motion to Stay (Appeal 22-1733)....................................................67

C.      Supersedeas Bond (23-1509) ............................................68

CONCLUSION ...................................................................................70

CERTIFICATE OF COMPLIANCE ................................................................71

CERTIFICATE OF SERVICE .....................................................................72

iv

# TABLE OF AUTHORITIES

## CASES

*Acevedo-García v. Vera-Monroig*, 296 F.3d 13 (1st Cir. 2002)............... 24, 68, 69

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002).....................35

*Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*,
   246 F.3d 1 (1st Cir. 2001) .................................................60

*Basic v. Levinson*, 485 U.S. 224 (1985) .................................31

*Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006)......................65

*Campbell v. Rainbow City*, 434 F.2d 1306 (11th Cir. 2006) ...............66

*CFTC v. JBW Capital*, 812 F.3d 98 (1st Cir. 2016) ...............46

*Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31 (1st Cir. 2008) .......................34

*Cordi-Allen v. Conlon*, 494 F.3d 245 (1st Cir. 2007) ................... 65, 66

*Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408 (1944).........................57

*Discovery House, Inc. v. Consol. City of Indianapolis*,
   319 F.3d 277 (7th Cir. 2003)............................................65

*Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529 (2d Cir. 1991) ...................34

*Hanly v. SEC*, 415 F.2d 589 (2d Cir. 1969)..............................40

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ..............................47

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*,
   348 F.3d 16 (1st Cir. 2003) ...........................................41

*In re PHC, Inc. Shareholder Litig.*, 894 F.3d 419 (1st Cir. 2018) .........................48

# TABLE OF AUTHORITIES (continued)

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
   669 F.3d 68 (1st Cir. 2012) ...............................................................34

*In re Vernazza*, Advisers Act Rel. No. 1994,
   2001 WL 1359521 (S.E.C. Nov. 5, 2001) .......................................49

*Jackson v. Smith*, 254 U.S. 586 (1921).....................................................57

*Kansas v. Nebraska*, 574 U.S. 445 (2015) ......................................... 43, 47

*Kokesh v. SEC*, 581 U.S. 455 (2017) ................................................. 45, 59

*LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980) ................................60

*Liu v. SEC*, 140 S. Ct. 1936 (2020)................................................ passim

*Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6 (2001) .......................41

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017) ....................................35

*Magruder v. Drury*, 235 U.S. 106 (1914).................................................48

*McCoy v. Town of Pittsfield*, 59 F.4th 497 (1st Cir. 2023) ........................... 59, 65

*Meléndez v. Autogermana, Inc.*, 622 F.3d 46 (1st Cir. 2010)......................... 67, 68

*Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952 (7th Cir. 2004) ..................... 7, 34

*Montford & Co., Inc. v. SEC*, 793 F.3d 76 (D.C. Cir. 2015)................................48

*Rubber Co. v. Goodyear*, 76 U.S. 788 (1869) ...........................................44

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) ............................................. 44, 49, 57

*SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985)........................................... 34, 48, 49

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ..............passim

TABLE OF AUTHORITIES (continued)

*SEC v. Caterinicchia*, 613 F.2d 102 (5th Cir. 1980) ........................................ 35, 38

*SEC v. Citigroup Glob. Markets Inc.*, 673 F.3d 158 (2d Cir. 2012) .................... 64

*SEC v. Clifton*, 700 F.2d 744 (D.C. Cir. 1983) ....................................................... 64

*SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008) .......................................................... 35

*SEC v. Genaudio, Inc.*, 32 F.4th 902 (10th Cir. 2022) ......................................... 46

*SEC v. Goulding*, 40 F.4th 558 (7th Cir. 2022) ................................................... 48

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) ............................................................. 50

*SEC v. Hallam*, 42 F.4th 316 (5th Cir. 2022) ....................................................... 44

*SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004) ......................................... 24, 46, 51, 52

*SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022) ..................................................... 56

*SEC v. Johnston*, 986 F.3d 63 (1st Cir. 2021) ............................................... 34, 35

*SEC v. Lemelson*, 57 F.4th 17 (1st Cir. 2023) ....................................................... 24

*SEC v. Liu*, 2022 WL 3645063 (9th Cir. 2022) ................................................... 55

*SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983) ................................................. 46

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ....................................................... 33

*SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021) ....................................................... 57

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) ................................................... 64

*SEC v. Sánchez-Díaz*, 88 F.4th 81 (1st Cir. 2023) .......................................... 43, 44

# TABLE OF AUTHORITIES (continued)

*SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008), *opinion withdrawn on other grounds*, 573 F.3d 54 (1st Cir. 2009), *and opinion reinstated in relevant part*, 597 F.3d 436 (1st Cir. 2010) (en banc)............5, 7

*SEC v. Washington Inv. Network*, 475 F.3d 392 (D.C. Cir. 2007)............ 6, 29, 34

*SEC v. World Tree Fin. LLC*, 43 F.4th 448 (5th Cir. 2022) ........................... 34, 56

*Startzell v. City of Philapdelphia*, 533 F.3d 183 (3d Cir. 2008) ...........................60

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979) ....................................................6

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ........................5

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ......................... 31, 32

*United States v. Armour & Co.*, 402 U.S. 673 (1971).............................................64

*United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)..............................................41

*Vélez-Ramírez v. Puerto Rico*, 827 F.3d 154 (1st Cir. 2016)......................... 23, 24

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ........................................ 7, 48, 49

*ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239 (11th Cir. 2017)................. 6, 12, 31

## STATUTES, RULES, AND OTHER AUTHORITIES

28 U.S.C. 1291.......................................................................................................2

National Defense Authorization Act for Fiscal Year 2021,
    Pub. L. No. 116-283, 134 Stat. 3388; *codified at* 15 U.S.C. 78u(d)(8) ..........57

11 U.S.C. 523(a)(19)(B)(iii) ................................................................................47

# TABLE OF AUTHORITIES (continued)

Investment Advisers Act of 1940, 15 U.S.C. 80b-1, *et seq.*

Section 203(e), 15 U.S.C. 80b-3(e)................................................67

Section 203(f), 15 U.S.C. 80b-3(f)................................................67

Section 206(1), 15 U.S.C. 80b-6(1) ...............................................6

Section 206(2), 15 U.S.C. 80b-6(2) ..............................................6

Section 209(d), 15 U.S.C. 80b-9(d)...............................................1

Section 209(e), 15 U.S.C. 80b-9(e)...............................................1

Section 214, 15 U.S.C. 80b-14......................................................1

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

Section 21(d)(3), 15 U.S.C. 78u(d)(3) .........................................43

Section 21(d)(5), 15 U.S.C. 78u(d)(5) .................................... 21, 42, 43, 47

Section 21(d)(7), 15 U.S.C. 78u(d)(7) .......................................... 42, 43, 47

Fed. R. Civ. P. 54(c) ...................................................................58

Fed. R. Civ. P. 56(a) .............................................................. 24, 38

Fed. R. Evid. 408(a) ...................................................................54

D. Mass. Local R. 62.2 ...............................................................68

Overview of the Global Investment Performance Standards, *available at*:
https://www.cfainstitute.org/en/membership/professional-development/refresher-readings/gips-overview .....................................12

ix

## TABLE OF AUTHORITIES (continued)

*Palmer's The Law of Restitution* (3d ed. 2020)................................................ 48, 49

Restatement (First) of Trusts (1935)....................................................................57

Restatement (Third) of Restitution and Unjust Enrichment .................. 46, 47

1 Dan B. Dobbs, *Dobbs Law of Remedies* (2d ed. 1993)................................ 46, 48

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    *Federal Practice and Procedure* (3rd ed. 2012) .................................................69

4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence*
    (5th ed. 1941) .....................................................................................................57

**20-1581, 21-1857, 22-1733, 23-1509**

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

### SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

**v.**

### NAVELLIER & ASSOCIATES, INC.; LOUIS NAVELLIER,

Defendants-Appellants.

---

On Review of Orders of the United States
District Court for the District of Massachusetts, 1:17-cv-11633-DJC

---

### BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---

### COUNTERSTATEMENT OF JURISDICTION

In this civil law enforcement action, the district court had jurisdiction under Sections 209(d), 209(e), and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. 80b-9(d), 80b-9(e), 80b-14. The court initially entered final judgment on June 2, 2020. 1-JA-24 (Dkt. [295]).[1] Thereafter, appellants Louis Navellier and Navellier & Associates, Inc.

---

[1]     "__-JA-__" refers to the Joint Appendix. "Br.__" refers to appellants' brief. "Dkt. [_]" refers to documents from the district court's docket below, unless otherwise specified. "ADDM-__" refers to the addendum filed with appellants' brief.

("NAI") sought this Court's review on four separate occasions, with each appeal challenging different orders.

Appeal 20-1581 challenges the June 2, 2020, judgment.  While that appeal was pending, the Commission obtained a limited remand for the court to reconsider its disgorgement determination in light of the intervening decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020).  On remand, the court issued an amended final judgment reflecting a revised disgorgement determination, which is challenged in Appeal 21-1857.

The remaining two appeals seek review of post-judgment orders. Appeal 22-1733 challenges an order denying appellants' motion to alter the amended final judgment and to stay administrative proceedings that the Commission instituted following the judgment.  Appeal 23-1509 challenges an order denying appellants' motion to reduce the supersedeas bond.

This Court consolidated those four appeals, each of which was timely filed.  This Court has jurisdiction under 28 U.S.C. 1291.  This brief addresses each of the appeals.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

The Commission brought this antifraud action under the Advisers Act against NAI, a registered investment adviser, and Louis Navellier, NAI's founder, Chief Executive Officer, and Chief Investment Officer. The undisputed evidence showed that appellants recommended an investment strategy that appellants misleadingly claimed was based on real trades of real investments for real clients between 2001-2008 and had "avoid[ed] the past two bear markets," including the then-recent Great Recession. In reality, the past performance of that strategy—which appellants licensed from another adviser—was not based on real trades. Appellants lacked any facts substantiating their claims of the underlying strategy's actual past performance, and they knew it.

Appellants were fiduciaries required to be loyal to, and act in the best interests of, their clients, but they never told their clients the truth. Instead, while recognizing in internal emails that the past performance of the strategy they were recommending was "made up and pure FRAUD," they continued using those misleading past performance claims to recommend the strategy, generating millions of dollars in advisory fees. And when appellants eventually became concerned about liability, they sought to

3

"cover [their] ass" and make a "big payday" for themselves by selling their clients' accounts to the very person they knew had fraudulently made up the past performance claims, generating additional millions in profits for themselves.

The issues presented are:

1.      Whether the court correctly concluded at summary judgment that appellants violated Advisers Act Sections 206(1) and (2).

2.      Whether the court acted within its discretion in ordering remedial sanctions, including injunctive relief, disgorgement, and civil penalties.

3.      Whether the court correctly concluded as a matter of law that the Commission did not selectively prosecute appellants.

4.      Whether the court acted within its discretion in denying appellants' motions for reconsideration, to amend the supersedeas bond amount, and to stay the Commission's separately instituted administrative proceedings against them.

COUNTERSTATEMENT OF THE CASE

## A.    Statutory and Regulatory Background

The Advisers Act "was the last in a series of Acts designed to eliminate certain abuses in the securities industry" that had "contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).  In enacting these laws, Congress intended "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."  *Id.*  Investment advisers who give trusted advice to clients about how to invest their money are held to the highest such standard:  they are fiduciaries.  *Capital Gains*, 375 U.S. at 190, 194.

The Advisers Act imposes "federal fiduciary standards" governing advisers' conduct (*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) (quotation omitted)) that require advisers "to act at all times in the best interest" of their "investors."  *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008), *opinion withdrawn on other grounds*, 573 F.3d 54 (1st Cir. 2009), *and opinion reinstated in relevant part*, 597 F.3d 436 (1st Cir. 2010) (en banc).  Specifically, advisers have an "affirmative duty of 'utmost good

faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' [their] clients." *Capital Gains*, 375 U.S. at 194.

Section 206(1) of the Advisers Act makes it unlawful for an adviser "to employ a device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. 80b-6(1). Section 206(2) prohibits advisers from "engag[ing] in a transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. 80b-6(2). Section 206(1) requires a finding of scienter, whereas Section 206(2) may be supported by a finding of negligence. *See Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979) (citing *Capital Gains*, 375 U.S. at 195).

A material misrepresentation may establish a violation under Sections 206(1) and (2). *See ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1247 (11th Cir. 2017). Moreover, Section 206 "prohibits failures to disclose material information, not just affirmative frauds." *SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007). Because Section 206 was intended "to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to

6

render advice which was not disinterested," an adviser's failure to disclose a potential conflict of interest constitutes a violation of that provision. *Capital Gains*, 375 at 191-93, 196-97, 200-01; *see also Tambone*, 550 F.3d at 146; *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004); *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). A violation of Section 206 does not require proof of "actual injury to the client." *Capital Gains*, 375 U.S. at 195.

## B.    Factual Background

### 1.    Navellier, NAI, and NAI's Leadership

Louis Navellier is a securities professional, with nearly 40 years of experience. Navellier founded NAI, a registered investment adviser, and he served as NAI's Chief Executive Officer and Chief Investment Officer. *See* Dkt. [242] at 7-8. In that capacity, Navellier chose which investment products NAI offered and which strategies it followed, approved the recommendation and sale of the products at issue here, and supervised NAI personnel providing investment advice to NAI clients. 1-JA-181; 9-JA-2266—2267. During the relevant period, appellants acted as investment advisers, providing investment advice concerning securities for compensation. Dkt. [242] at 7-10. Arjen Kuyper (NAI's President) and Peter Knapp (NAI's Chief Financial Officer, Chief Compliance Officer, and

General Counsel) also were part of NAI's leadership and reported to Navellier.  Dkt. [242] at 77, 85.

### 2.    Commission staff warned appellants three times to stop making misleading claims about the performance of investment products.

In 1999, 2003, and 2007, the Commission's Office of Compliance Inspections and Examinations ("OCIE") sent letters to appellants citing their repeated failure to adequately disclose that performance figures appellants had advertised about other NAI investment products had come from models, not from trading real assets in real time.  *See* 8-JA-2057—2088. In its 2007 letter, OCIE stated its "concern[] that NAI may not have taken these comments seriously" and that "NAI should be aware that the [Commission] staff views repeat violations as a serious matter and considers recidivist behavior when making a determination on whether to refer matters to enforcement staff for possible further actions."  8-JA-2084—2085.

### 3.    Appellants misleadingly recommended an investment strategy based on a performance history that they knew was not verifiable.

In September 2009, Knapp met with Howard Present, the founder of F-Squared Investments, Inc., to conduct due diligence on the F-Squared

AlphaSector strategies in service of NAI potentially licensing those strategies under NAI's name. ADDM-93. Present claimed that F-Squared's AlphaSector strategies had been used to manage real client assets between 2001-2008, and that those strategies had significantly outperformed the S&P 500 Index between that same time. *See* 12-JA-3027. But when Knapp asked to review documents to validate the purported strategies' performance, Present declined. *See id.*

Navellier knew NAI did not have any data substantiating AlphaSector's 2001-2008 performance. *See* 12-JA-3036. Shortly after meeting with Present, Knapp prepared for Navellier an "Executive Summary" detailing the results of his due diligence on F-Squared AlphaSector. Knapp stated that "[F-Squared] flat out won't show the math to us" supporting its performance claims for AlphaSector, which, Knapp acknowledged, "would knock [F-Squared] out of contention" from being considered as a strategy that appellants should offer to their clients. 9-JA-2156. Knapp later testified that he repeatedly asked Present to see documentation supporting F-Squared's performance claims, but Present "couldn't produce anything to show these were actually traded." 12-JA-3028. Kuyper also testified that NAI "couldn't confirm [Present's claims,

9

and so] . . . we had to treat the record that [Present] was citing as it's not verifiable . . . you can't really rely on it."  12-JA-3035.  NAI never received trading confirmations for the performance returns from F-Squared.  12-JA-3032.

Nevertheless, Navellier had NAI license the AlphaSector strategies from F-Squared.  *See* ADDM-93.  Under that agreement, F-Squared sent appellants information to implement each licensed AlphaSector strategy under NAI's Vireo AlphaSector brand, and appellants invested NAI clients' money accordingly.  *See id.*

In 2010, appellants began recommending the Vireo AlphaSector investment strategies to existing and prospective clients.  In disclosures to clients and prospective clients, appellants claimed that the strategy underlying the Vireo AlphaSector strategies (*i.e.*, F-Squared's AlphaSector strategy) had successfully traded actual securities for actual clients since April 2001.  ADDM-93—94.  For example, NAI represented that:

- There was a "live track record for U.S. equity sleeve – stress tested across two bear markets";
- AlphaSector had "avoid[ed] the past two bear markets";
- "[L]ive assets began tracking the strategies" on April 1, 2001, for "U.S. Equity";

10

- The "strategy the index is based on [has] an inception date of April 1, 2001";

- The performance results from 2001 were "not back-tested" (*i.e.*, hypothetical);

- The index results are "based on an active strategy with an inception date of April 1, 2001.  Inception date is defined as the date as of which investor assets began tracking the strategy."

*See* 11-JA-2867—12-JA-3020.

Appellants admitted in their answer to the Commission's complaint that, when they disseminated those statements, they lacked sufficient knowledge to confirm whether their claims about AlphaSector's performance history—*i.e.*, the strategy underlying Vireo AlphaSector— were true.  10-JA-2493 (¶5); *see also* 12-JA-3036.

### 4.   Appellants recognized that the performance history of the strategy they recommended was "pure FRAUD," but they continued selling it to clients and never told clients the truth.

During a March 2011 conference call with an analyst and Knapp, Present admitted that the AlphaSector strategy's performance was *not* based on actual trades beginning in April 2001.  9-JA-2158.  Knapp testified that, upon hearing this revelation:

11

> [T]o me, the sh*t hits the fan in our firm. It's like, Holy Cow. You know, he's been telling us actual, actual, actual, and then in a pretty important conference call for us, because we wanted to get the platform, he says it's not [based on] actual [trades]. We're like, what?

12-JA-3031.

The next month, Navellier emailed Knapp, Kuyper, and other NAI

personnel concerning NAI's lack of support for its "live trading" claims,

stating:

> What is so frustrating about [F-Squared] and Vireo is the ongoing lies. . . . I was told the numbers were GIPS verified.[2] [That was a] Lie . . . . I was told that we had all the trade confirms. [That also was a] Lie . . . . I am now told that we just have a spreadsheet. Any idiot can make up numbers on a spreadsheet! [That was another] Lie . . . . Obviously, I have to distance myself from [F-Squared] when it blows up and am still trying to figure out how to reduce Navellier's liability, since when the lies become evidence, we are out of business, especially if we get caught in a downdraft.

12-JA-3040.

---

[2]　"GIPS" are the Global Investment Performance Standards, which "are based on the ideals of fair representation and full disclosure of an investment management firm's performance history." *See* Overview of the Global Investment Performance Standards, *available at*: https://www.cfainstitute.org/en/membership/professional-development/refresher-readings/gips-overview; *see also ZPR Inv. Mgmt. Inc.*, 861 F.3d at 1245.

When Knapp reminded Navellier that he had informed him in the

October 2009 Executive Summary that there was no data supporting their

2001-2008 "live trading" claims, Navellier responded:

> Peter, I went to get the [F-Squared AlphaSector] confirms yesterday to see the firm that built the record and I was told that there were no confirms, just a spreadsheet. I was shocked. Any idiot can send in a bogus spreadsheet! That is not due diligence, that is stupidity. . . . I have no idea of how to avoid liability on this fiasco. . . .

12-JA-3039.

Later that day, Kuyper responded to Navellier, stating that it

"[s]ounds like we should: 1) figure out how to spin off or shut down

Vireo[;] 2) see if we can get comfortable with [F-Squared's] numbers –

and/or improve disclosures[; and] 3) do a better job of promoting [NAI's]

growth products[.]" 12-JA-3038. Navellier replied that "[w]e just have to

cover our ass somehow." *Id.* Shortly after sending that email, Navellier

took steps to remove NAI and Navellier from "as many [Vireo-related]

documents [as] you can, such as Advisory Agreements, the Web Site, etc."

12-JA-3037—3038.

In the following months, Navellier continued emailing NAI staff

about the lack of support for representations about AlphaSector's track

13

record.  For instance, in May 2011, Navellier said that "[u]nless somebody shows me the confirms, [F-Squared] is merely a model and I am protecting the firm from potential fraud so we must not talk about [F-Squared] as being base[d] on real $ since 2001."  9-JA-2162.  Nevertheless, Navellier stated that he was "not stopping Vireo [AlphaSector] sales and [would] send tough questions to [Knapp]."  *Id.*

Then, in August 2011, Navellier emailed NAI leadership, stating that "Vireo was a good idea, but we sold the wrong product that continues to smell like FRAUD, especially since no one can find the [F-Squared] indices . . . .  Maybe we can try to sell the Vireo managed account business . . . so [NAI management] can have a big payday."  9-JA-2168.  Later that month, Navellier again proposed selling the Vireo AlphaSector business because "having indices that cannot be found or daily pricing smells to high heaven," their model "is just made up and pure FRAUD," and "I am not going to be convicted for fraud."  9-JA-2171.  For the next two years, NAI continued using its materially misleading claims about AlphaSector's performance to recommend Vireo AlphaSector products to prospective clients, while continuing to look for a buyer for the Vireo business.  *See* 11-JA-2867—12-JA-3020.

14

In January 2013, NAI entered into a consulting agreement with ACA Compliance Group to review the Vireo AlphaSector disclosures. Kuyper informed Ted Eichenlaub, an ACA representative analyzing those materials, that the claimed performance results for AlphaSector were hypothetical and incorrect. 12-JA-3074 (Eichenlaub's contemporaneous notes of call with Kuyper); 12-JA-3066—3067. Kuyper also told Eichenlaub that: F-Squared could not provide any confirmation of their performance claims for the AlphaSector strategies; "there was no way to confirm the actual trades for actual accounts;" and NAI's disclosures incorrectly had stated that Vireo AlphaSector's actual returns "[went] back 10 years" to 2001. 12-JA-3092—3093; 12-JA-3069. Eichenlaub responded that, "if [NAI is] going to show the numbers, you can't disclose away the basis/legitimacy of the numbers. [NAI] must have a basis for representing these numbers and the legitimacy of the numbers" in its disclosures. 12-JA-3120; *see also* 12-JA-3126 (similar).

### 5. Appellants sold the Vireo business to F-Squared to maximize their own gains and avoid liability.

Rather than correct their representations to clients, obtain support from F-Squared for their 2001-2008 performance claims, or notify clients of

the inaccuracies contained within their Vireo AlphaSector disclosures, appellants instead chose to rid themselves of the Vireo AlphaSector business. Even more, they sold it to F-Squared—the same entity that Navellier was simultaneously saying had perpetrated a "pure FRAUD."

In March 2013, Navellier executed a letter of intent on behalf of NAI to sell the Vireo AlphaSector strategies "and associated client accounts using such strategies" to F-Squared. 9-JA-2188. F-Squared agreed to pay NAI $14 million in cash, assuming that there were "at least $1.1 billion in revenue generating client assets transfers at [the] time of closing." *Id.*

The next month, Navellier emailed NAI employees to inform them of the impending F-Squared sale, explaining that he agreed to the sale because "F-Squared refuses to stop circulating its fake 10+ year AlphaDEX indexes before the ETFs actually commenced on May 10, 2007." 9-JA-2191. Navellier stated that this was "a massive due diligence failure" by NAI, that "[w]e were tipped off to F-Squared's fraud by an ex-SEC enforcement officer, so we have no other choice . . . than to clean up this mess ASAP," and that NAI was "at risk of a $225,000 fine" from the Commission for its misconduct. *Id.*

But when NAI informed its clients that it had sold the Vireo AlphaSector business to F-Squared the following month, NAI gave no hint that their money would be managed by a fraudster. *See* 9-JA-2229. Instead, NAI stated that, upon completion of the sale, "the only material change for clients is that the strategy names will change from the Vireo AlphaSector strategies to the F-Squared AlphaSector strategies." *Id.* NAI did not inform clients the reasons for the sale that Navellier had articulated in his April 2013 email to NAI employees, or that Navellier believed that F-Squared had committed fraud and that AlphaSector's performance history was "fake" and built on "lies." *See id.* NAI also did not disclose to clients that its recommendations about AlphaSector's 2001-2008 performance were materially misleading or that appellants had no factual support for making those claims. *See id.* Appellants admit that they never informed their clients that there was no evidence supporting their materially misleading representations about AlphaSector's historical performance. Dkt. [242] at 135 (¶77).

17

**C.     Procedural Background**

> **1.     The Commission filed a complaint against appellants, and the court allowed the Commission's motion for partial summary judgment on liability.**

**a.** On August 31, 2017, the Commission filed a complaint alleging that appellants violated Sections 206(1) and 206(2) of the Advisers Act. *See* Dkt. [1].[3] The Commission also brought civil enforcement actions and administrative proceedings against 20 other investment advisory firms and individuals for misrepresenting the track record of F-Squared's AlphaSector strategies, in violation of antifraud provisions of the Advisers Act. *See* 10-JA-2539—11-JA-2766. Of those 22 parties, 19 settled with the Commission—only Present, Navellier, and NAI did not settle. *See* 10-JA-2539—11-JA-2766.

**b.** After a hearing and upon consideration of the parties' briefing and the evidence presented, the court allowed the Commission's motion for

---

[3]     The Commission also alleged that Navellier aided and abetted NAI's violations of Advisers Act Sections 206(1) and (2), and that NAI violated Advisers Act Section 206(4). ADDM-108—109. After prevailing on partial summary judgment, the Commission moved to dismiss those claims, and they are not at issue in this appeal. ADDM-84—87.

summary judgment with respect to Advisers Act Sections 206(1) and 206(2).  *See* ADDM-90, ADDM-103—108.

The court determined that "the undisputed evidence and [appellants'] own admissions" showed that appellants had defrauded investors by making "false and misleading statements regarding the performance of the AlphaSector strategies."  ADDM-104.  The court concluded that appellants' deception was material as a matter of law, particularly given that appellants had touted the Vireo AlphaSector strategies "as defensive strategies that had been 'stress tested across *two* bear markets'" between 2001-2008.  ADDM-104—105.  Citing statements from Navellier, Kuyper, and Knapp, the court also concluded that:

> NAI, through their management team and Navellier in particular, were aware that they had not obtained sufficient support for the claims included in their marketing of the AlphaSector strategies and that they did not take any action to inform their clients, but instead continued to sell the strategies while exploring options for selling the business.

ADDM-107.  "Such actions demonstrate an intention to defraud clients or, at least, a high degree of recklessness in violation of Section 206(1)."  *Id.*

The court then concluded that "[t]he same evidence supporting a finding" that appellants violated Section 206(1) "supports a finding that [appellants] violated Section 206(2)." ADDM-107—108.

**c.** The summary judgment ruling also resolved appellants' defense that the Commission had selectively prosecuted appellants and had violated their Equal Protection rights under a "class of one" theory. *See* ADDM-97—102. The court rejected appellants' selective-prosecution argument because it found that: appellants failed to meet their burden to establish that the comparator firms they identified were similarly situated in all relevant aspects to appellants; appellants had engaged in more severe misconduct than those comparator firms; and appellants failed to establish that "the SEC sought to enforce more harshly against [appellants] following the breakdown in settlement negotiations." ADDM-100. The court likewise rejected appellants' "class-of-one" argument, concluding that "[i]t is undisputed that the SEC has initiated enforcement proceedings against numerous similarly situated entities and against one individual, Present," and that the Commission "has offered a rational basis for any difference in treatment between [appellants] and others similarly situated." ADDM-101—102.

### 2. The court imposed permanent injunctions, civil penalties, and disgorgement on appellants.

**a.** The court permanently enjoined appellants from violating Advisers Act Sections 206(1) and 206(2) and ordered that NAI and Navellier respectively pay civil penalties of $2 million and $500,000. ADDM-9—10.  The court also ordered appellants to disgorge jointly and severally $28,964,571 (plus interest).

After appellants appealed the judgment, the Supreme Court held in *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims" is permissible equitable relief under Exchange Act Section 21(d)(5), 15 U.S.C. 78u(d)(5).  In addition, *Liu* identified "principles that may guide" how disgorgement should be measured, apportioned, and distributed.  140 S. Ct. at 1947-50.  Upon the Commission's motion, this Court ordered a limited remand permitting the district court to reassess its disgorgement award in light of *Liu*'s guidance.  *See* 1-JA-26 (Dkt. [322]).

**b.** On remand, the district court reduced the disgorgement amount by approximately one-quarter, directing that disgorged funds would be disbursed to appellants' defrauded Vireo clients.

21

The court reasoned that disgorgement was appropriate "to deprive [appellants] of unjust profits they made from their repeated fraudulent marketing misrepresentations and failures to disclose material information to clients about the Vireo products." ADDM-13—14. Based on appellants' income statements, the court found that appellants' gross ill-gotten gains equaled more than $36 million: (1) the $22,775,867 in investment advisory fees Vireo AlphaSector clients paid between 2011 and 2013; plus (2) the $14,000,000 appellants received from the sale of the Vireo business to F-Squared in September 2013. ADDM-19—20. Consistent with *Liu*'s directive that disgorgement be limited to the "net profits from wrongdoing after deducting legitimate expenses," 140 S. Ct. at 1946, the court deducted $14,041,380 in what it found were "legitimate investment advisory business [expenses] conducted by NAI on behalf of Vireo clients"—$13,502,785 for licensing fees paid to F-Squared for using AlphaSector; $494,598 in salaries for employees not involved in NAI's sales and marketing department; and $43,997 in office-related expenses. *See* ADDM-21—23, ADDM-27.

The court found that a joint-and-several disgorgement award was appropriate because "Navellier had final authority over NAI's fraudulent activity," and appellants were thus "engaged in concerted wrongdoing."

22

ADDM-15, 16; *see Liu*, 140 S. Ct. at 1949 ("The common law did … permit [collective] liability for partners engaged in concerted wrongdoing.").  The court found further that disgorgement was "for the benefit of investors" within the meaning of *Liu* and Exchange Act Section 21(d)(5) because disgorged funds would be returned, if feasible, to the clients and prospective clients of Vireo whom appellants defrauded.  ADDM-17.

### 3.    The court issued post-judgment orders

The court denied appellants' post-judgment motions to alter the amended judgment, to stay administrative proceedings that the Commission instituted against appellants following the summary judgment ruling, and to reduce the supersedeas bond.  This Court consolidated the appeals from those orders with the appeals from the judgment and the amended judgment.  *See supra* at 2.

### STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment *de novo*, applying the same legal standards that bound the district court.  *See Vélez-Ramírez v. Puerto Rico*, 827 F.3d 154, 157 (1st Cir. 2016).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  This Court may affirm the district court's

decision on any ground supported by the record.  *Vélez-Ramírez*, 827 F.3d at

157.  The district court's order imposing injunctions, civil penalties, and

disgorgement is reviewed for an abuse of discretion.  *See SEC v. Lemelson*,

57 F.4th 17, 30 (1st Cir. 2023); *SEC v. Happ*, 392 F.3d 12, 31-32 (1st Cir. 2004).

Orders denying a motion to stay a judgment pending appeal and ordering

a supersedeas bond are likewise "entrusted to the discretion of the trial

court."  *Acevedo-García v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002).

## SUMMARY OF ARGUMENT

1.     The court correctly found appellants liable at summary

judgment for violating Advisers Act Sections 206(1) and 206(2).  The

undisputed evidence shows that appellants violated their fiduciary duty

when they misleadingly recommended a strategy based on performance

claims that they knew they lacked support for.  Appellants further violated

their fiduciary duty by selling the Vireo AlphaSector business to F-

Squared—which they knew to be operated by a fraudster—to generate a

"big payday" for themselves while attempting to avoid liability.  None of

appellants' arguments creates a genuine dispute as to their liability.

2.     The court acted within its discretion in ordering remedies.

24

a.     Disgorgement ensures that appellants do not profit from undue benefits they secured from breaching their fiduciary duties.  Because disgorgement's controlling objective is preventing a wrongdoer's unjust enrichment, a showing that appellants' clients suffered pecuniary harm was not necessary.  Regardless, appellants harmed their clients by charging them fees for fiduciary advisory services while blatantly violating those fiduciary duties.

The court reasonably measured appellants' ill-gotten gains.  Appellants obtained millions of dollars by charging fees for managing accounts that they sold based on fraudulent performance history misrepresentations, and by failing to disclose that they lacked a basis for those past performance claims and that they were selling the clients' accounts to be managed by a fraudster.  The court limited the disgorgement award to appellants' net profits by deducting appellants' legitimate expenses from the gross proceeds.  Joint-and-several disgorgement was appropriate because appellants engaged in concerted wrongdoing.

b.     Appellants' remaining remedies challenges are meritless.  The court properly applied the ten-year statute of limitations for scienter-based

violations that Congress made expressly applicable to pending cases.

Appellants' challenges to the court's imposition of injunctive relief and

penalties are based on the incorrect premise that they did not engage in

wrongdoing.

3.     Appellants' selective enforcement and "class-of-one" challenges

fail.  Appellants have not demonstrated that the comparator firms they

identified were similarly situated in all relevant aspects to appellants, that

they were treated differently than other similarly situated advisers, or that

the Commission acted with a malicious intent in charging appellants.

4.     Appellants' post-judgment challenges are meritless.  The court

acted within its discretion in denying appellants' motion to reconsider the

court's summary judgment and disgorgement determinations based on

arguments the court already had considered and rejected.  Appellants'

challenge to the court's stay determination is likewise a restatement of

meritless arguments the district court and this Court already have

considered and rejected.  The court's decision not to reduce the

supersedeas bond was reasonable where appellants provided no legitimate

evidentiary basis for ordering a bond lower than the amount required

under the rules.

26

**ARGUMENT**

I.    **The court properly concluded that the Commission was entitled to summary judgment against Navellier and NAI.**

The court properly concluded as a matter of law that appellants violated Advisers Act Sections 206(1) and 206(2).  The undisputed evidence shows that appellants lied to prospective clients about AlphaSector's performance history to get them to become Vireo AlphaSector clients, failed to disclose to clients and prospective clients that they never had any basis for those performance claims, and never told clients that their true motivation for selling the Vireo business was to avoid liability while maximizing their own gain.  All the while, appellants made tens of millions of dollars from advisory fees and the sale of the Vireo business to F-Squared—a company that Navellier, on multiple occasions, had acknowledged was engaged in a decade-long, "obvious fraud."  9-JA-2191.  Through this conduct, appellants repeatedly violated their "relationship of 'trust and confidence'" with their clients and flouted their obligation 'to employ reasonable care to avoid misleading' [their] clients."  *Capital Gains*, 375 U.S. at 194.

27

**A.    The court correctly held that appellants defrauded their clients.**

**1.    Appellants repeatedly breached their fiduciary duty to clients.**

**a.** Contrary to appellants' claims (Br.44-49), there can be no genuine dispute that appellants' representations that the Vireo AlphaSector products were based on a strategy (F-Squared AlphaSector) that had successfully invested real money for real clients since April 2001 were false. In fact, the supposed "active strategy with an inception date of April 1, 2001" was an algorithm developed years later by a college student who had no access to actual data, and who was only 14 years old when his strategy purportedly began being "live traded."  10-JA-2555—2557.

Present admitted to the falsity of such past performance claims in his March 2011 conference call with an analyst and Knapp.  *See supra* at 11.  F-Squared also admitted as much in its settlement of the Commission's administrative proceeding against it.  *See* 10-JA-2553—2559.  And a jury found that Present violated Advisers Act antifraud provisions for making materially false and misleading statements about the AlphaSector strategy being live-traded since 2001.  *See* 11-JA-2765; *see also SEC v. Present*, 14-cv-14692, Dkt. [388] (D. Mass.).  These undisputed facts were before the court

at summary judgment when it correctly concluded that "[t]he record includes multiple examples of NAI-created marketing materials that include false and misleading statements regarding the performance of the AlphaSector strategies." ADDM-104.

Despite offering no contrary evidence, appellants erroneously argue (Br.45-47) that their claims about AlphaSector were not false because they referenced an "index." As the court concluded, those references were materially misleading because appellants represented that the index was based on real assets trading in real time since April 1, 2001 (ADDM-104—105), and it is undisputed that no such actual trading happened.

**b.** Appellants' liability is independently supported by undisputed facts showing that they breached their fiduciary duty of care and loyalty to clients in other ways.

Section 206 "prohibits failures to disclose material information, not just affirmative frauds." *Washington Inv. Network*, 475 F.3d at 404. Appellants violated that principle when they repeatedly told clients that F-Squared AlphaSector's performance history was based on "live-trading" without disclosing the crucial information that they had asked Present and F-Squared for supporting information but were never provided any, that

29

the only support for the existence of AlphaSector's performance history was hearsay from the person who stood to profit from selling the strategy (Present), and that appellants knew that such unverified information should have knocked AlphaSector "out of contention" from being offered as a strategy.

Appellants maintain that an October 26, 2009, letter from NASDAQ OMX to the Chief Compliance Officer for Virtus Investment Partners "proves" that appellants possessed the requisite data to support their claims about AlphaSector's past performance. *See* Br.48. But the court held—and appellants do not dispute—that "NASDAQ did not conduct any independent testing" on F-Squared's performance claims. ADDM-106. The letter does not include any data, but merely restates Present's unsupported and bogus claims about AlphaSector's 2001-2008 performance. *See* 1-JA-190—193. In any event, as discussed *supra* (at 9-17) the evidence, including Navellier's own statements, overwhelmingly establishes that appellants did not have, and never received, that data— and appellants knew it. After all, as F-Squared admitted, no such data exists. *See* 10-JA-2553—2559.

Appellants also failed to disclose to Vireo clients that they sold the Vireo business to the very person they suspected of fraud—Present—to generate a "big payday" for themselves, while seeking to avoid liability. These undisputed facts show a staggering betrayal of clients' trust and self-dealing that violates Section 206. *See Capital Gains*, 375 U.S. at 196 ("An investor seeking the advice of a registered investment advisor must … be permitted to evaluate … overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving 'two masters' or only one, 'especially if one of the masters happens to be economic self-interest.'").

## 2.     Appellants' fraud was material.

The court correctly concluded as a matter of law that appellants' deception was material. A fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in'" making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 231 (1985) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also ZPR Investment Mgmt*, 861 F.3d at 1248-49 (applying same materiality standard under Advisers Act). Courts may resolve materiality on summary judgment where, as here, the information is "so obviously

31

important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Industries*, 426 U.S. at 450.

There can be no genuine dispute that appellants' misrepresentations were material. Appellants' unsupported misrepresentations about AlphaSector's performance history speak to the risk inherent in the investment. *See supra* at 10-11. A reasonable investor thus would find it obviously important that AlphaSector did not use real investments to navigate then-recent bear-markets—including the greatest financial crisis since the Great Depression. She also would find it obviously important that appellants recommended and charged fees for the strategy despite having no basis to support their claims that its performance record was based on real trading. And she would find it obviously important that, while actively concealing their fraud, appellants sold the accounts managed according to the concededly fraudulent strategy back to Present—the fraudster whom Navellier accused of repeated "lies"—to "cover [Navellier's] ass" and generate a "big payday" for NAI management.

Indeed, Commission staff had repeatedly warned appellants that it is materially misleading to falsely represent that a strategy's performance

32

history is based on real trades when in fact it is based on a hypothetical model.  *See supra* at 8.   Kuyper (NAI's President) testified that accurate information about AlphaSector's performance history *was* material.  9-JA-2231—2232.  And Knapp (NAI's Chief Financial Officer, Chief Compliance Officer, and General Counsel) explained that F-Squared's "flat out" failure to show appellants the data supporting their "live trading" claims would "knock [F-Squared] out of contention" from being considered as a strategy that appellants should recommend.  9-JA-2156.

Moreover, "a major factor in determining whether information was material is the importance attached to it by those who knew about it."  *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997).  Navellier repeatedly emailed NAI personnel that the AlphaSector deal was a "major due diligence disaster" that would subject NAI to liability, removed NAI and Navellier from "as many [Vireo-related] documents" as possible (12-JA-3037—3038), and ultimately sold Vireo accounts to F-Squared.  *See supra* at 12-17.

Appellants contend (Br.56) that there is no evidence that investors relied on appellants' claims in becoming clients.  But a showing of "actual injury to clients" is not required under the Act (*Capital Gains*, 375 U.S. at 192), and "the SEC does not need to prove reliance on the investment

33

adviser's misleading statements." *Washington Inv. Network*, 475 F.3d at 405; *accord SEC v. World Tree Fin., LLC*, 43 F.4th 448, 465 (5th Cir. 2022) (same); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) (same); *Monetta Fin. Servs.*, 390 F.3d at 955 (whether a conflict actually affected the adviser's recommendations "is of no consequence"); *see also Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) ("[I]t is well-established that a material fact need not be outcome-determinative.").

### 3.    Appellants acted with scienter.

"Scienter can be established by showing 'either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness.'" *SEC v. Johnston*, 986 F.3d 63, 74 (1st Cir. 2021) (quoting *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 37 (1st Cir. 2008)).  A high degree of recklessness "demands 'a highly unreasonable omission,' one that not only involves 'an extreme departure from the standards of ordinary care,' but also 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Corban*, 868 F.3d at 37 (quoting *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68, 77 (1st Cir. 2012)); *see also Johnston*, 986 F.3d at 74.  Scienter may be resolved on summary judgment where "the

nonmoving party rests merely upon conclusory allegations, improbable

references, and unsupported speculation." *See SEC v. Ficken*, 546 F.3d 45,

51 (1st Cir. 2008). This is just such a case. The undisputed facts show that

appellants knowingly or recklessly misled clients, betrayed those clients'

trust, and obtained millions of dollars by placing their own interests first.

**a.** "[A] defendant's publication of statements when that defendant

'knew facts suggesting the statements were inaccurate or misleadingly

incomplete is classic evidence of scienter.'" *Johnston*, 986 F.3d at 74

(quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)); *accord*

*Lorenzo v. SEC*, 872 F.3d 578, 583 (D.C. Cir. 2017) (scienter established by

sending emails that defendant knew to contain false and misleading

statements); *SEC v. Caterinicchia*, 613 F.2d 102, 106 n.7 (5th Cir. 1980)

(deliberately withholding material information "clearly satisfies the

scienter requirement"). The undisputed facts demonstrate that appellants

engaged in that precise conduct.

Appellants knew they did not have support for their claims that

AlphaSector's performance was based on live trading in real securities

since 2001, but they made those claims to clients and prospective clients

anyway when they recommended the Vireo AlphaSector strategy. During

35

NAI's due diligence on the F-Squared AlphaSector strategies in 2009, Knapp acknowledged that "F-Squared flat out won't show the math [supporting the AlphaSector 2001-2008 performance] to us." 9-JA-2156. Kuyper testified that NAI "couldn't confirm" Present's AlphaSector 2001-2008 performance claims, and he acknowledged that "we had to treat the record that [Present] was citing as it's not verifiable.'" 12-JA-3035. NAI's Rule 30(b)(6) witness also testified that NAI never received any data or trading confirms to support the performance claims that AlphaSector was "live-traded" since 2001, and she admitted that appellants did not have any documentation substantiating the performance record they had represented for AlphaSector. 11-JA-2865—2866. This is to say nothing of Present's March 2011 admission that AlphaSector's performance was not based on actual trades and Navellier's multiple emails to NAI personnel stating that NAI never received the data confirming AlphaSector's 2001-2008 performance. *See supra* at 11-17.

Appellants also knew or were highly reckless in not knowing that they had an obligation to accurately represent an investment strategy's performance results. Commission examiners issued three separate exam deficiency letters to NAI informing appellants of that obligation generally.

36

ACA—the compliance professionals appellants hired to review their Vireo disclosures—reminded appellants of that obligation vis-à-vis Vireo specifically.  Kuyper (NAI's President, whose knowledge is attributable to NAI) also knew that, without data substantiating the performance claims, "you can't use [those claims]" to represent real trading.  12-JA-3035.  And Navellier emailed NAI personnel that appellants' inaccurate and unsupported performance claims would subject NAI to liability.

Nevertheless, appellants continued touting AlphaSector's 2001-2008 performance and charging clients millions in advisory fees for that strategy.  And then, to "reduce Navellier's liability" before the "lies" were revealed to be "evidence," and to make "a big payday" for themselves, appellants sold the Vireo business to F-Squared and Howard Present—who Navellier repeatedly had claimed were selling a model whose performance history was "just made up and pure FRAUD."

**b.**  Appellants argue that Navellier lacked scienter because his emails were a series of "unsupported fabrications" made not to defraud clients, but as part of "a vigorous campaign to discredit Howard Present and the Vireo AlphaSector-based products in order to scare NAI's marketing people to stop selling Vireo, even though they were raising a substantial

37

amount of assets." Br.58. But that argument neither addresses nor challenges the court's finding that *NAI* acted with scienter. Accordingly, appellants' challenge to Navellier's scienter—which he surely had—does not create a genuine dispute about NAI's scienter.[4]

Appellants' argument also does not create a genuine dispute as to Navellier's scienter. Navellier claims that he was trying to "disparage the Vireo products and discourage their sale" and to encourage the sale of NAI's core products, not to defraud clients. Br.58. But the Advisers Act does not "require proof of intent to injure" (*Capital Gains*, 375 U.S. at 195), and defendants' contention that they "did not intend to harm investors does not negate a finding of scienter." *Caterinicchia*, 613 F.2d at 102, 106 n.7. Moreover, and setting aside that Navellier's post-hoc explanation is highly implausible given the evidence presented and thus does not raise a "genuine" dispute of fact (Fed. R. Civ. P. 56(a)), the court correctly found

---

[4]    Appellants do not challenge the court's conclusion that other NAI officers—including Knapp and Kuyper, whose knowledge is attributable to NAI—were aware that appellants' performance claims about AlphaSector lacked support and failed to tell clients the truth. *See* ADDM-105.

that appellants' explanation is beside the point because any dispute of fact it raises is not material to appellants' liability.

As the court correctly reasoned, appellants' post-hoc rationalization "does not change the fact that [appellants] made the actionable statements [about AlphaSector's 2001-2008 track record] to clients or the undisputed record that [appellants] were, at a minimum, highly reckless in making statements to clients about [the past performance of] investment strategies" without having any data to confirm the actual performance.  ADDM-107. Nor does appellants' story change the fact that they flagrantly — and, at minimum, recklessly — put their own interests ahead of their clients' interests when they sold the Vireo business to F-Squared and Present.

Appellants claim (Br.49) that they "understood" from a letter from NASDAQ OMX to another adviser that their AlphaSector performance claims were true.  But as discussed previously (at 30), that letter merely restates Present's unsupported claims about AlphaSector's performance. And nothing in NASDAQ OMX's letter speaks to appellants' breach of trust about other material information, such as the real reasons that appellants sold off the Vireo business.

Moreover, investment advisers "cannot deliberately ignore that which [they have] a duty to know and recklessly state facts about matters of which [they are] ignorant." *Hanly v. SEC*, 415 F.2d 589, 596 (2d Cir. 1969). Appellants knew that they had not received any data supporting AlphaSector's 2001-2008 performance. *See supra* at 9-17. Navellier's emails further confirm that "there were no confirms, just a spreadsheet," and that AlphaSector was "just a model." *See supra* at 12-17. Accordingly, even if appellants had chosen to ignore those facts in favor of unsupported statements in a letter from NASDAQ to another adviser, that shows that appellants' presentation of AlphaSector's past performance represented an extreme departure from the standards of ordinary care and that, therefore, appellants at minimum acted with extreme recklessness in violation of Section 206(1). It also shows that appellants failed to "employ reasonable care to avoid misleading" clients in violation of Section 206(2). *Capital Gains*, 375 U.S. at 194.

## B. The court acted within its discretion in admitting and considering the communications between NAI and ACA Compliance Group.

Appellants' argument (Br.59) that the court improperly considered privileged communications with ACA Compliance Group in granting

summary judgment also fails. The privilege "protects 'only those communications that are confidential and are made for the purpose of seeking or receiving legal advice.'" *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (2001) (quoting *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003)). While such a protection "possibl[y] exten[ds]" to third parties assisting a lawyer in rendering legal advice, such third-party communications are protected only where the third party is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)). "[T]he attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *In re Keeper of Records*, 348 F.3d at 22.

Appellants attempt to fit the ACA communications within that narrow third-party privilege window, arguing that ACA "was hired at the behest of NAI's attorney to assist him in providing legal advice to NAI and [Navellier] in anticipation of possible litigation with the SEC." Br.59. But appellants' claim is contradicted by their statements here that "ACA is not a law firm," "expressly gave no legal opinion," and "did *not* opine" on the

41

falsity of the disclosures appellants made. *Id.* (emphasis in original). Thus, by appellants' own admission, ACA could not have been "necessary, or at least highly useful" in analyzing and assessing appellants' potential liability arising from their disclosures.

## II. The court acted within its discretion in ordering remedies.

### A. The court acted within its discretion in ordering appellants jointly and severally to disgorge their ill-gotten gains.

To "deprive [appellants] of unjust profits," the court ordered appellants jointly and severally to disgorge $22,734,487 (plus $6,635,403 in interest) in net profits, to be disbursed to appellants' clients. ADDM-13-14. Appellants do not challenge the evidentiary basis for the court's disgorgement findings. The challenges they do raise lack merit.

#### 1. The court properly ordered disgorgement to deprive appellants of their ill-gotten gains.

Exchange Act Section 21(d)(5), authorizes the Commission to seek, and federal courts to award, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. 78u(d)(5). A "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible" under that provision. *Liu*, 140 S. Ct. at 1940. Disgorgement is also available under provisions that

Congress enacted after *Liu*, which authorize courts in Commission actions to award disgorgement to remedy "unjust enrichment."  15 U.S.C. 78u(d)(3), (d)(7).  Although these provisions appear in the Exchange Act, they apply in Commission proceedings "under any provision of the securities laws."  15 U.S.C. 78u(d)(5), (d)(7).  And within limits prescribed by Congress, courts' remedial power under these provisions is "enhanced" because it is used to vindicate "federal law."  *Kansas v. Nebraska*, 574 U.S. 445, 463 (2015).

Disgorgement of ill-gotten gains is ordered to reflect the "foundational principle" that "it would be inequitable that a wrongdoer should make a profit out of his own wrong."  *Liu*, 140 S. Ct. at 1943 (internal quotation marks omitted).  By "tak[ing] money out of the wrongdoer's hands," disgorgement restores the violator to "the status quo"—a result "squarely within the heartland of equity."  *Id.*; *see also SEC v. Sánchez-Díaz*, 88 F.4th 81, 87-88 (1st Cir. 2023).  Depriving a wrongdoer of its ill-gotten gains is the "controlling consideration" of disgorgement, founded in "reason and justice," because permitting a wrongdoer to retain

ill-gotten gains "would offer a premium to dishonesty." *Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869).[5]

Appellants argue (Br.72) that, under *Liu*, disgorgement of "any amount would not be equitable" because appellants' clients "did not lose a penny" and received profits from NAI. That argument finds no basis in *Liu*, equity practice, or the text of the applicable remedies statutes. It is especially misconceived in this case, involving breaching fiduciaries. And it is unsupported by the facts.

**a.** Far from requiring victims to suffer a pecuniary harm, *Liu* holds that disgorgement is "tethered to a wrongdoer's net unlawful profits." 140 S. Ct. at 1943. The Supreme Court repeatedly underscored that disgorgement is a "profits-based," not loss-based, form of relief, when it described the nature, purposes, and limits of the remedy. *Id.* at 1944; *see also, e.g., id.* at 1945 ("profits-based remed[y]"); *id.* at 1946 ("profits from

---

[5]    This Court has applied the "equitable principles behind disgorgement" to govern the scope of disgorgement under the post-*Liu* amendments. *Sánchez-Díaz*, 88 F.4th at 88. The Commission agrees that disgorgement under the amendments is equitable. *See also SEC v. Ahmed*, 72 F.4th 379, 395-96 (2d Cir. 2023). *But see SEC v. Hallam*, 42 F.4th 316, 341, 343 (5th Cir. 2022). Regardless, the award on appeal does not turn on whether disgorgement is deemed equitable or legal.

wrongdoing"); *id.* at 1948 ("profits remedy"); *id.* at 1949 ("profits-focused remedy"); *id.* at 1950 ("profits-based remedy").  For example, the focus on the violator's *gain* is what limits disgorgement to the wrongdoer's "net profits," even when victims' *losses* would call for higher awards.  *Id.* at 1950.

The equitable imperative to prevent unjust enrichment illustrates why disgorgement is appropriate without showing that the plaintiff—in this civil enforcement action, the Commission—has any "special relationship" with the violator.  *Id.* at 1944.  A key premise of the Supreme Court's disgorgement jurisprudence is that "when the SEC seeks disgorgement, it acts in the public interest, to remedy harm to the public at large, rather than standing in the shoes of particular injured parties." *Kokesh v. SEC*, 581 U.S. 455, 463 (2017) (internal quotation marks omitted). "The violation for which the remedy is sought is committed against the United States rather than an aggrieved individual—this is why, for example, a securities-enforcement action may proceed even if victims do not support or are not parties to the prosecution."  *Id.*

This Court has similarly long held that disgorgement is an exercise of discretion to prevent unjust enrichment, not an award of damages to which

a plaintiff is legally entitled.  *See Happ*, 392 F.3d at 31-32.  Accordingly, this

Court has "urge[d]" courts to "clearly" distinguish disgorgement of

"defendant profit[s]" from "losses suffered by the victims."  *CFTC v. JBW*

*Capital*, 812 F.3d 98, 111 & n. 21 (1st Cir. 2016) (citing *SEC v. MacDonald*, 699

F.2d 47, 54 (1st Cir. 1983) (en banc)); *see also SEC v. Genaudio, Inc.*, 32 F.4th

902, 952-53 (10th Cir. 2022) (distinguishing disgorgement from investor

loss).

The "teachings of equity treatises" (*Liu*, 140 S. Ct. at 1944), likewise

instruct that the "major unifying thread" of profits-based restitution "is to

prevent the defendant's unjust enrichment by recapturing the gains the

defendant secured in a transaction."  1 Dan B. Dobbs, *Dobbs Law of Remedies*

551-52, 555 (2d ed. 1993).  Therefore, disgorgement "differs in its goal or

principle from damages, which measures the remedy by the plaintiff's loss

and seeks to provide compensation for that loss."  *Id.* at 555; *see also*

Restatement (Third) of Restitution and Unjust Enrichment §1, cmt. a (a

wrongdoer can be required to give up unjust enrichment "without the need

to show that the claimant has suffered a loss"); *id.*, §51 cmt. d (similar).

Wrongdoers would otherwise have an incentive to ignore their obligation

under the securities laws where actual damages cannot be proven or fall

below their profits.  *See Id.* §3, cmt. c (disgorgement is ordered "because any lesser liability would provide an inadequate incentive to lawful behavior"); *accord Kansas*, 574 U.S. at 463.

Appellants' argument also contradicts *Liu*'s instruction that statutory references to a "remedy grounded in equity" should not be understood to "silently rewrite" or alter the "contours" of historical practice.  140 S. Ct. at 1947.  If Congress wished to drastically depart from equity practice, it would have made its "desire plain."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944).  But no text in the provisions authorizing disgorgement in SEC cases as "equitable relief" to remedy "unjust enrichment" (15 U.S.C. 78u(d)(5), (7)) includes a novel pecuniary-harm requirement.  Quite the opposite, Congress has expressly distinguished "disgorgement" by securities-law violators from "damages" to victims.  11 U.S.C. 523(a)(19)(B)(iii).

**b.**  Appellants' argument is particularly misplaced because they profited from abusing a fiduciary position.  The argument "that a claim of breach of fiduciary duty requires a showing of damages … runs headlong into a wall of precedent.  The case law holds with conspicuous clarity that when a fiduciary has secured an undue advantage by virtue of his position,

47

equitable relief is available even in the absence of direct economic loss to the complaining party." *In re PHC, Inc. Shareholder Litig.*, 894 F.3d 419, 426 (1st Cir. 2018). Thus, a trustee may be held liable for profits gained in breach of fiduciary duty, and "[i]t makes no difference that the estate was not a loser in the transaction, or that the commission was no more than the services were reasonably worth." *Magruder v. Drury*, 235 U.S. 106, 118-20 (1914). "The duties of a fiduciary are among the most important known to the law, it is indispensable that there be some sanction for their breach, and often the only effective sanction is restitution in favor of the principal of gains realized by the fiduciary." *Palmer's The Law of Restitution* §2.12 at 330 (3d ed. 2020). Accordingly, "[b]reach of fiduciary duty of any kind, if it yields gains to the fiduciary, is a favorite ground for restitution." 1 *Dobbs Law of Remedies* at 553.

Courts thus hold that disgorgement equal to an investment adviser's ill-gotten gains is an appropriate remedy for violations of the Advisers Act. *See, e.g.*, *SEC v. Goulding*, 40 F.4th 558, 561-62 (7th Cir. 2022) (unauthorized fees); *Montford & Co., Inc. v. SEC*, 793 F.3d 76, 83-84 (D.C. Cir. 2015) (fees from undisclosed conflict of interest); *Vernazza*, 327 F.3d at 862-63 (same); *Blavin*, 706 F.2d at 713 (fees obtained by unregistered adviser). Courts also

48

reject the "misguided belief that disgorgement" requires "proof that investors suffered loss" from an adviser's violations (*Blavin*, 706 F.2d at 713) and order disgorgement even when the adviser contends that his victim benefitted from the violation. *See, e.g.*, *Ahmed*, 72 F.4th at 397-98 ("The fact that Oak, a victim of Ahmed's fraud, might have gotten a 'bargain' on the share purchase should not redound to the fraudster's benefit."); *see also In re Vernazza*, Advisers Act Rel. No. 1994, 2001 WL 1359521, at *12 (S.E.C. Nov. 5, 2001) (similar); *Palmer's the Law of Restitution* §2.12 at 330 ("Sometimes a breach causes loss to the principal but frequently it does not, and in these circumstances there is no satisfactory remedy except restitution.").

Moreover, appellants' contention that their victims suffered no monetary harm is counterfactual.  Advisers' "basic function" is "furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments."  *Capital Gains*, 375 U.S. at 187.  Vireo clients paid fees in exchange for the receipt of fiduciary advisory services from appellants.  Appellants' "[c]lients were harmed because they were deceived" (*Vernazza*, 327 F.3d at 863) and deprived of the advisers' core promise of rendering advice in the clients' best interest.

49

And appellants caused the clients monetary harm by charging tens of millions in fees for recommending a strategy with a performance history appellants knew was "pure FRAUD" and by selling their clients' accounts to be managed (and charged fees) by the very person who devised the fraudulent performance history.[6]

    **c.** Although *Liu* does not require a showing of pecuniary harm to order disgorgement, the "equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." 140 S. Ct. at 1948. Consistent with *Liu*, the court found that "disgorgement here will be for the benefit of investors and the SEC will return Defendants' gain to wronged investors"—the defrauded Vireo clients. 1-JA-29 (Dkt. [361]). Appellants' argument that *Liu* also means that the court lacked authority to order a penny of disgorgement and that

---

[6]    In *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), the court held that the district court abused its discretion in ordering disgorgement without finding that victims suffered pecuniary harm. Insofar as *Govil* categorically requires a finding of pecuniary harm before ordering disgorgement, it is incorrect and contrary to binding precedent in this Circuit for the reasons discussed.

appellants are legally entitled to keep their ill-gotten gains has no statutory basis and offends foundational equitable principles.[7]

## 2. The court reasonably calculated appellants' ill-gotten gains.

In seeking disgorgement, the Commission bears the burden of establishing a reasonable approximation of the defendant's actual profits. *Happ*, 392 F.3d at 31. Once the Commission has done so, "the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." *Id.* Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty. *See id.*

Here, the Commission introduced undisputed evidence showing that appellants earned $36,775,867 in gross proceeds from the Vireo AlphaSector business between 2011 and 2013. Of the total amount,

---

[7] The post-*Liu* amendments omit Section 21(d)(5)'s requirement that relief be "for the benefit of investors"—a phrase that *Liu* construed as a "limitation[]" or "restrict[ion]" on a court's equitable authority to disburse funds to the Treasury. *Id.* at 1947-49. That issue is not relevant here because the Commission is not seeking to disburse collected disgorged funds to the Treasury.

$22,775,867 in revenue came from client fees for NAI's Vireo AlphaSector business, while $14 million came from the sale of the Vireo AlphaSector business to F-Squared.  *See* 13-JA-3400.  Consistent with *Liu*'s directive that disgorgement awards be restricted to "net profits from wrongdoing after deducting legitimate expenses," *Liu*, 140 S. Ct. at 1946, the court deducted from those gross proceeds $14,041,380 in what it found were legitimate expenses ($13,502,785 for licensing fees paid to F-Squared for using AlphaSector; $494,598 in salaries for employees not involved in NAI's sales and marketing department; and $43,997 in office-related expenses).  *See* ADDM-21—23, ADDM-27.  Appellants' challenges to the award are meritless.

**a.**  Appellants argue (Br.76-78) that there is no causal connection between their fraud and the Vireo-related advisory fees appellants obtained because the Commission did not submit evidence proving that Vireo clients paid those advisory fees because of the misleading disclosures.  But, as noted, a showing of investor reliance is not necessary in this case, and disgorgement need only be a reasonable approximation of profits causally connected to the violation.  *Happ*, 392 F.3d at 31.  Here, the

causal connection between appellants' fraud and their ill-gotten gains is obvious.

Appellants admit that they distributed the misleading Vireo materials to be recommended to prospective NAI clients and that each investor in a Vireo product became an NAI client. *See* Dkt. [242] at 140. Once those investors became clients, they paid NAI advisory fees, while appellants continued recommending the Vireo AlphaSector products using fraudulent representations and knowingly violated their fiduciary duties to their clients by continually failing to tell them the truth about AlphaSector's track record.  ADDM-20.

The proceeds from the Vireo sale to F-Squared—the same entity that Navellier internally had acknowledged at the time of the sale to be perpetrating a "pure FRAUD"— has a similarly strong connection.  As the court found below (and appellants do not dispute), appellants "had a substantial incentive not to disclose their misrepresentations and the reason they were selling the business" because the Vireo sale price "was largely dependent on the number of clients who transferred to F-Squared (instead of terminating their client relationship)."  ADDM-20.  Put simply: the more Vireo clients there were at the time of the sale, the more money

appellants received by sending those clients' funds to be managed by a fraudster.

Appellants nonetheless argue (Br.78-80) that disgorgement must be limited to two of the six Vireo strategies they sold because the Commission acknowledged below that appellants had introduced some Vireo disclosures that did not contain materially misleading misrepresentations about AlphaSector's performance.  But the Commission consistently argued below—and the district court found—that appellants had issued materially misleading disclosures for *all* Vireo strategies.  ADDM-104—105. The Commission introduced undisputed evidence supporting that finding. *See* 12-JA-2920—2958; 9-JA-2144—2154.  Whether appellants used other disclosures that were not misleading thus does not undermine the conclusion that appellants made misstatements for all Vireo strategies.[8]

---

[8]    Contrary to appellants' assertion (Br.78), Commission staff's discussions of a disgorgement figure during settlement discussions—a figure NAI ultimately rejected—do not constitute "admissions" that disgorgement is limited to that figure. *See* Fed. R. Evid. 408(a) (settlement offer "is not admissible . . . to prove or disprove the validity or amount of a disputed claim . . . .").

**b.**  Appellants next argue (Br.74-75) that *all* their claimed expenses were legitimate, rather than "only" the $14,041,380 the court deducted.  But expenses that have no "value independent of fueling a fraudulent scheme" (*Liu*, 140 S. Ct. at 1950) need not be deducted, and the court accordingly declined to offset "those expenses related to the execution of the fraud." Dkt. 361 [entry language]; *see SEC v. Liu*, 2022 WL 3645063, at *3 (9th Cir. 2022) (ruling, following remand from the Supreme Court, that payments made to "prevent the exposure of Liu's fraudulent activities" were not deductible).  Moreover, defendants bear the risk of uncertainty in the calculation and, beyond incorrectly asserting that they did not commit fraud, appellants fail to explain how *all* their expenses were legitimate.

Appellants' argument (Br.74) that the court erroneously failed to offset disgorgement with the underlying investment profits appellants returned to their clients is frivolous.  An adviser returns investment profits to the client because they are profits on the *client's* money to which the client was entitled.  Appellants cannot receive a credit against the fees they illegally obtained through fraud because they gave their clients investment profits that belonged to them.

Appellants claim (Br.68-69) that they repaid their Vireo clients all advisory fees *in addition to* returning their profits is baseless and should also be rejected. Appellants never gave back any fees to Vireo clients.

### 3. The court reasonably held Navellier and NAI jointly-and-severally liable for disgorgement.

Contrary to appellants' argument (Br.75), the court acted within its discretion in imposing disgorgement against appellants on a joint-and-several basis because these defendants engaged in "concerted wrongdoing." *Liu*, 140 S. Ct. at 1949. Navellier owned and controlled all aspects of NAI during the relevant period, he and NAI engaged in concerted misconduct that generated the unlawful gains, and both defendants benefited from their misconduct. ADDM-15—17 (¶¶12-19).

This is "exactly the situation" in which *Liu* permits joint-and-several liability. *World Tree Fin.*, 43 F.4th at 467 n.15; *see also SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022). This is not a situation where profits can be sensibly apportioned among multiple wrongdoers, or one in which a violator is held liable for profits that "accrued to another, and in which [he] ha[d] no participation." *Liu*, 140 S. Ct. at 1949. Joint-and-several liability is particularly appropriate because defendants were fiduciaries. *See Crites,*

*Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 414 (1944); *Jackson v. Smith*, 254 U.S. 586, 589 (1921); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* §1081 at 231, §1082 at 237-38, n.6 (5th ed. 1941); Restatement (First) of Trusts, §224 (1935).

### B.    Appellants' remaining remedies challenges fail.

**1.**  There is no merit to appellants' argument (Br.80-81) that the ten-year statute of limitations Congress enacted in 2021 governing claims under Section 206(1) and "any other provision of the securities laws for which scienter must be established" is unconstitutionally retroactive.  *See* National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, sec. 6501, 134 Stat. 3388, 4625-26; *codified at* 15 U.S.C. 78u(d)(8).  Congress expressly stated that the new limitations period "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, [January 1, 2021]."  NDAA Section 6501(b), 134 Stat. at 4626.  The ten-year statute of limitations thus governs.  *See Ahmed*, 72 F.4th at 400-01; *SEC v. Morrone*, 997 F.3d 52, 55 n.3 (1st Cir. 2021).

Appellants also are incorrect (Br.80) that the Commission was required to amend its claim seeking disgorgement for profits before August 10, 2011.  The Commission's complaint alleged that appellants'

57

fraud began in May 2010, and it sought an order requiring appellants "to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest," along with "other and further relief as the Court deems just and proper." *See* Dkt. [1] at 1, 12-15, 19-20. Moreover, courts "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

Appellants are not entitled (Br.81) to a reduction of their disgorgement obligation because NAI had a net loss in 2010. The court reasonably found that appellants did not meet their burden of showing that those 2010 expenses were legitimate. 1-JA-29. In any event, the Commission did not seek, let alone obtain, disgorgement for appellants' 2010 violations.

**2.** Appellants' challenge (Br.81) to the prejudgment interest calculation fails. It rests solely on the flawed argument that "there is no amount of equitable disgorgement" available in this case.

Appellants' challenges to their civil penalties and injunctions likewise fail because they are based on the incorrect argument that the Commission "failed to prove any wrongdoing." Br.81.

**III.    The court correctly rejected appellants' affirmative defense that the Commission selectively enforced this case against them.**

This case against appellants is one of almost two dozen antifraud actions that the Commission brought against various entities and individuals who, like appellants, recommended investment products by misleadingly claiming that the strategy underlying those products (F-Squared AlphaSector) was based on live trading since April 2001. Appellants nevertheless assert that the Commission violated their equal protection rights by "selectively enforcing" this case against them and, alternatively, by impermissibly treating them as a "class-of-one." *See* Br.60-67.  Neither argument has any merit.

**A.    Selective Enforcement**

Congress vested the Commission with "broad authority to conduct investigations into possible violations of the federal securities laws." *Kokesh*, 581 U.S. at 458.  In order to show that an agency has selectively prosecuted a party, the party must show that: "(1) the [party], 'compared with others similarly situated, . . . was selectively treated; and (2) such selective treatment was 'based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional

59

rights, or malicious or bad faith intent to injure [the party].'"  *See McCoy v. Town of Pittsfield*, 59 F.4th 497, 508 (1st Cir. 2023) (quoting *Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)). Appellants have not demonstrated either element.

### 1. Appellants have not shown that they were selectively treated.

Appellants argue that the Commission's decision to bring an enforcement action against them—but not against other advisers who recommended products falsely touting AlphaSector's past performance—violates their equal protection rights.  *See* Br.60-67.  But even "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection."  *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980).  And, as noted, the Commission sought relief against others who misleadingly had claimed that AlphaSector had been live-traded since April 2001.

Moreover, as the district court correctly concluded, appellants "failed to meet their burden to establish that the comparators they identify are similarly situated in all relevant aspects to NAI and Navellier."  ADDM-99 (citing *Startzell v. City of Philapdelphia*, 533 F.3d 183, 203 (3d Cir. 2008)). Unlike the two comparator advisers appellants mention in their brief—

Wells Fargo Advisors and Beaumont Financial Group—appellants created

their own disclosures, which contained multiple misstatements concerning

AlphaSector's track record, and which appellants continued to use long

after they were aware that those performance claims were untrue and

unfounded. *See supra* at 9-17.[9]  Appellants also ignore that—unlike other

entities they claim are comparable—Commission staff had warned

appellants on three previous occasions about having made similar

misleading past performance claims, Navellier repeatedly had identified

appellants' representations about AlphaSector's past performance as

fraudulent, and appellants sold the Vireo business to try to avoid liability

rather than inform clients of the truth.  *See supra* at 8-17.

> ### 2.  Appellants have not shown that the Commission brought this action against them in bad faith.

**a.**  Appellants' argument that the Commission brought this case in

bad faith (Br.63) rests on the erroneous premise that the Commission and

---

[9]    Appellants also claim that NAI was similarly situated to "others," whom they fail to identify.  *See* Br.61-62.  To the extent those "others" are "sweep case" advisory firms that had "wrap fee" contracts with NAI, appellants' argument fails largely for the same reason as their failed comparison to Wells Fargo and Beaumont.  *See* ADDM-99 (court opinion rejecting this argument); *see infra* at 63.

appellants had reached a settlement agreement in which NAI would pay a civil penalty and disgorgement without admitting that it acted willfully or receiving a censure. But the undisputed evidence shows that no such agreement was ever reached.

Commission staff consistently told appellants that any offer of settlement would require NAI to pay a civil penalty, disgorgement, and agree to a censure (which required an admission of willful conduct). *See* 11-JA-2767—2770 (two separate "reverse proffers" to appellants that staff would recommend that the Commission seek injunctions, censure, disgorgement, and civil penalties against appellants); 11-JA-2786—2789 (Wells Notice to appellants with similar statements).

Staff also repeatedly explained that appellants' case was like the Commission's settlement with Virtus Investment Advisers—which also included disgorgement, a civil penalty, and a censure—because that case involved "significant" evidence of misconduct in connection with the sales of the AlphaSector strategies. *See* 11-JA-2826; 11-JA-2782; *see also* 10-JA-

2616−2626 (Virtus settlement).[10]  Commission staff likewise explained that

other F-Squared-related settlements that did not include disgorgement or a

censure (the "sweep cases") were not comparable to appellants' case

because there was "significantly more evidence of misconduct" by

appellants than by the defendants in those sweep cases.  11-JA-2826.

Critically, staff reminded appellants throughout the negotiations that

"[a]ll staff recommendations are subject to approval by both the Division of

Enforcement and the Commission" and that "there is no settlement until

Commission approval."  8-JA-2051.  And the Commission never approved

any settlement agreement with NAI, let alone a settlement without a

censure or an admission that NAI acted willfully.  The Commission thus

---

[10]    Appellants' case closely paralleled the terms in the Virtus settlement, along with the terms of settlements the Commission had reached with Ameriprise Financial Services and Horter Investment Management. Because the Ameriprise and Horter settlements had not been announced at the time of negotiations with appellants, staff did not explain to appellants that those settlements were also comparators to appellants' case. Nevertheless, given the significant evidence of misconduct those three firms engaged in, all three settlements resulted in the adviser being censured for willful violations of the Advisers Act and ordered to pay disgorgement and a civil penalty.  *See* 10-JA-2616−2626 (Virtus); 11-JA-2730−2738 (Ameriprise), 11-JA-2739−2746 (Horter).

could not have acted vindictively in breaching a settlement agreement that never existed.  *See* Br.63.

**b.**  There also is no merit to appellants' argument (Br.63-65) that the Commission staff's decision not to seek in litigation the same reduced sanctions offered in settlement discussions shows that staff acted with malicious intent.  "Compromise is the essence of a settlement."  *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).  "[N]umerous factors" affect a litigant's decision to settle a case or litigate it to the end, including "*the prospects of coming out better, or worse, after a full trial*, and the resources that would need to be expended in the attempt."  *SEC v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 164 (2d Cir. 2012) (emphasis added).  "The SEC's resources are limited, and that is why it often uses [settlements] as a means of enforcement," even where, as here, their case against a party is strong. *Randolph*, 736 F.2d at 529 (citing *SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983)).

Although the case against appellants is strong, Commission staff was willing to propose a settlement with reduced remedies against appellants to avoid the uncertainty of litigation.  But appellants rejected staff's

settlement offer in favor of defending themselves at trial—a risk they said they were "very comfortable" taking. 8-JA-2053. Appellants' voluntary decision to run the known risks of forgoing a settlement and defending themselves at trial, not any malicious intent by Commission staff, brought all available remedies into play.

Appellants erroneously argue (Br.66-67) that the Commission is estopped from disputing that it acted in bad faith because it refused appellants' requests to produce additional documents concerning its enforcement decisions against other advisers. But the court reasonably denied appellants' document requests and deposition topics as "overbroad and not proportional." ADDM-100 (citing Dkt. [175] (1-JA-16—17). Appellants have not challenged that discovery ruling.

### B.    Class-of-One

Appellants' class-of-one challenge fares no better. Parties claiming a class-of-one equal protection violation bear a "'very significant'" burden of showing "'*specific instances* where persons situated similarly in *all relevant aspects* were treated differently.'" *Cordi-Allen v. Conlon*, 494 F.3d 245, 250–51 (1st Cir. 2007) (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)) (emphases added) (quoting *Discovery House, Inc. v. Consol. City of*

*Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003))).  Given the "substantial

overlap" between selective enforcement and "class-of-one" claims, *McCoy*,

59 F.4th at 509, appellants' failures to show (1) that they are similarly

situated to Wells Fargo, Beaumont, or "others" in "all relevant aspects" and

(2) that the Commission acted with malicious intent likewise doom their

"class-of-one" challenge.

Moreover, a class-of-one defense cannot be asserted where similar

enforcement has been sought against other similarly situated parties.  *See*

*Cordi-Allen*, 49 F.3d at 254 ("By definition, a class of one is not a class of

many." (citing *Campbell v. Rainbow City*, 434 F.2d 1306, 1317 (11th Cir.

2006))).  Appellants admitted below that they are similarly situated to 20

other advisers against which the Commission initiated enforcement

proceedings.  *See* 10-JA-2528—2536; Dkt. [242] at 15-16.  Three of those

advisers were offered (and agreed to) the same settlement terms appellants

rejected.  *See* Dkt. [242] at 31-37; *see supra* at 60-62 & n.10.  And the one

other party who rejected the Commission staff's proposed settlement terms

and defended the Commission's charges at trial (Present) was ordered to

pay civil penalties and disgorgement and was later barred from the

industry after a jury found him liable for securities fraud in connection

66

with his fraudulent misrepresentations about AlphaSector's performance.

*See* 11-JA-2765; *see also SEC v. Present*, 14-cv-14692 (D. Mass), Dkt. [367]

(order denying Present's motion for judgment as a matter of law); Dkt.

[385] (remedies order); Dkt. [388] (final judgment).

## IV.    Appellants' post-judgment challenges lack merit.

### A.    Reconsideration Motions (Appeals 20-1581 and 22-1733)

Appellants challenge (Br.82) the court's refusal to reconsider its

summary judgment and amended disgorgement decisions.  But it is not an

abuse of discretion to deny reconsideration where, as here, the movant has

"simply restated his argument" and "claim[ed] that the district court

misconstrued [that] argument."  *Meléndez v. Autogermana, Inc.*, 622 F.3d 46,

56 (1st Cir. 2010); *see also* Dkt. [382] (1-JA-31) (denying motion to reconsider

because appellants' motion "rehashes arguments previously made and

considered by the Court" and "shows no clear error with the findings of

fact").

### B.    Motion to Stay (Appeal 22-1733)

The district court and this Court already have considered and

rejected appellants' argument (Br.84-86) that the Commission's follow-on

administrative proceedings against them should be stayed.  *See* 1-JA-31—33

(Dkt. [385]); ADDM-5 (denying motion "essentially for the reasons stated by the district court"); *see* Advisers Act Sections 203(e), (f), 15 U.S.C. 80b-3(e), (f) (permitting follow-on administrative proceedings against advisers enjoined from acts involving securities fraud).  Reconsideration is unwarranted because appellants have "simply restated" their arguments in favor of a stay.  *Meléndez*, 622 F.3d at 55-56.

Regardless, appellants' claim that they will be irreparably harmed by an associational bar is unfounded.  As the court found below, appellants face a "range of sanctions" in the administrative proceeding, "and none of them [is] a certainty."  1-JA-32.  Appellants also will have an opportunity to challenge any sanctions the Commission imposes before an appropriate court of appeals.  *Id.*

### C.    Supersedeas Bond (Appeal 23-1509)

Appellants' supersedeas bond challenge (Br.82-84) is meritless.  As appellants acknowledge, "[t]he nature and the amount of [a supersedeas] bond is entrusted to the discretion of the trial court."  *Acevedo-García*, 296 F.3d at 17.  Local Rule 62.2 in the district court requires that a supersedeas bond staying execution of a money judgment "shall be in the amount of the judgment plus 10%"—here, $33 million.  D. Mass. Local R. 62.2.  While

courts may lower the bond amount if appellants can show severe financial hardship, "the burden is on the party seeking a waiver of the bond requirement to demonstrate that the judgment is not at a risk." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §2905, at 720-22 (3rd ed. 2012). Parties seeking to reduce the supersedeas bond amount therefore must provide "adequate documentation supporting" their request. *Acevedo-García*, 296 F.3d at 17.

Here, the district court considered a financial report from appellants and found that the proposed $1.5 million bond— less than 5% of the amount required under the rules—"is not justified" given the financial information contained in appellants' report. ADDM-3. The court also reasonably rejected the arguments appellants re-raise here, finding that "[w]hether all such assets would be reachable by judgment in this case is different [from] whether [those assets] could be collateral for a bond that exceeds the $1-1.5 million" bond appellants sought. *Id.*

69

## CONCLUSION

This Court should affirm the district court's amended final judgment and orders rejecting appellants' post-judgment challenges.

Respectfully submitted,

MEGAN BARBERO
General Counsel

DANIEL STAROSELSKY
Assistant General Counsel

 /s/ Paul G. Álvarez
PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov

January 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, according to the word processing program with which it was prepared (Microsoft Word for Microsoft 365), this brief contains 12,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because the brief uses a 14-point proportionally spaced typeface.


           */s/ Paul G. Álvarez*
           PAUL G. ÁLVAREZ
           Senior Appellate Counsel

           Securities and Exchange Commission
           100 F Street, N.E.
           Washington, D.C.  20549
           (202) 551-5038 (Álvarez)
           alvarezp@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that today, January 8, 2024, a copy of the foregoing brief was filed with the Court's CM/ECF system, thereby effecting service on appellants.  I further certify that, upon notification from the clerk's office accepting the brief as filed, I will submit nine identical paper copies to the Court.


 */s/ Paul G. Álvarez*
PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov