# United States Court of Appeals
## For the First Circuit

———————————

Nos. 20-1581, 21-1857, 22-1733, 23-1509

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

NAVELLIER & ASSOCIATES, INC.; LOUIS NAVELLIER,

Defendants, Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

———————————

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges.

———————————

Samuel Kornhauser for appellants.

Paul G. Álvarez, Senior Appellate Counsel, with whom Megan
Barbero, General Counsel, and Daniel Staroselsky, Assistant
General Counsel, Securities and Exchange Commission, Washington,
D.C., were on brief, for appellee.

———————————

July 16, 2024

———————————

GELPÍ, **Circuit Judge**.    In 2017, the Securities and Exchange Commission ("SEC") brought suit against investment advisers Louis Navellier ("Navellier") and Navellier & Associates, Inc. ("NAI") (collectively, "Appellants"), alleging violations of sections 206(1) and 206(2) of the Investment Advisers Act ("Advisers Act"), 15 U.S.C. § 80b-6(1)-(2).    After the United States District Court for the District of Massachusetts granted summary judgment in favor of the SEC and, inter alia, ordered disgorgement in an amount exceeding $22 million, Appellants appealed.    They then moved the district court to stay pending appeal and to alter or amend its judgment, both of which the district court denied.    Appellants appealed from this denial. Finally, Appellants appealed from the district court's denial of their motion to reduce the supersedeas bond.    We consolidated the appeals and now affirm.

### I. BACKGROUND

### A. Statutory Background

The Advisers Act[1] "was the last in a series of Acts designed to eliminate certain abuses in the securities industry." SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 186 (1963). In drafting the Advisers Act, Congress recognized that "the national public interest and the interest of investors are

---

[1] Pub. L. No. 76-768, 54 Stat. 847 (1940) (codified as amended at 15 U.S.C. §§ 80b-1 to 80b-21).

adversely affected . . . when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients." Investment Trusts and Investment Companies: Hearings Before a Subcomm. of the Comm. on Banking & Currency on S. 3580, 76th Cong. 30 (1940). The Advisers Act thus "substitute[s] a philosophy of full disclosure for the philosophy of caveat emptor" and prescribes federal fiduciary standards for investment advisers. Cap. Gains, 375 U.S. at 186; Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 471 n.11 (1977).

At issue here are sections 206(1) and 206(2) of the Advisers Act. Section 206(1) makes it unlawful for an investment adviser "to employ any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Section 206(2), in turn, prohibits an investment adviser from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2).

## B. Factual Background

We draw the following facts from the summary judgment record and present them in the light most favorable to Appellants. See González-Piña v. Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005).

During the relevant time period, Navellier was the majority owner, Chief Investment Officer ("CIO"), and Chief

Executive Officer ("CEO") of NAI, an SEC-registered investment advisory firm. As CIO and CEO, Navellier had authority, along with NAI's Board of Directors, to decide which investment strategies NAI offered its clients and to sell NAI's business lines. Navellier was also "responsible for [the] supervision of individuals providing investment advice to [NAI's] clients." At all relevant times, Navellier and NAI acted as "investment advisers" within the meaning of the Advisers Act.[2]

### 1. SEC Communications with NAI

From 1999 to 2007, the SEC's Office of Compliance Inspections and Examinations ("OCIE") sent NAI three letters detailing compliance deficiencies in NAI's marketing materials. In 1999, OCIE's first letter informed NAI of its failure to adequately disclose that some of its marketed performance figures "d[id] not represent actual trading using client assets, but were achieved through a form of back-testing." As relevant to this action, "back-testing" is the process by which an investment strategy is retroactively applied to historical market data (the

---

[2] The Advisers Act defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11). The Advisers Act defines "person" as "a natural person or a company." 15 U.S.C. § 80b-2(a)(16).

prices of underlying securities during a past time period) as if the strategy had actually been used to trade assets during that time period. Back-tested investment strategies thus generate underlying hypothetical performance figures and benefit from hindsight. By contrast, "live" or "active" investment strategies are in fact used to trade assets, thus generating actual performance figures, and reflect "investment decisions [made] at the time of execution."

In 2003, OCIE's second letter again warned NAI of its failure to prominently disclose that some of its marketed, back-tested performance figures were "purely hypothetical and constructed based on the benefit of hindsight." Finally, in 2007, OCIE's third letter detailed similar compliance deficiencies. In this third letter, OCIE noted its "concern[] that NAI may not have taken [the previous letters] seriously," and stated that the SEC "views repeat violations as a serious matter and considers recidivist behavior when making a determination on whether to refer matters to the enforcement staff for possible further actions."

## 2. AlphaSector Strategy

In or around 2001, Jay Morton ("Morton"), at the time the principal owner of a wealth management firm, developed a "defensive, sector rotation investment strategy" meant to invest in exchange-traded funds ("ETFs").[3] The investment strategy was

_____

[3] An ETF "is a pooled investment security that can be bought and sold like an individual stock. ETFs can be structured to track

thereafter licensed by investment advisory firm Newfound Research LLC ("Newfound").  In 2008, investment advisory firm F-Squared Investments, Inc. ("F-Squared") licensed the strategy from Newfound and rebranded it as the "AlphaSector" strategy.

In October 2009, Peter Knapp ("Knapp"), NAI's General Counsel and Chief Compliance Officer, met with Howard Present ("Present"), President and CEO of F-Squared, to conduct due diligence on the AlphaSector strategy in connection with NAI potentially licensing and offering the strategy to their clients. Present claimed that the AlphaSector strategy was a live investment strategy.  Specifically, Present told Knapp that, from 2001 to 2008, a wealth management firm had used the AlphaSector strategy to manage real client accounts and trade actual assets, and that the strategy's performance figures were based on those trades. However, when Knapp asked Present for the trade confirmations that would support Present's claim, Present responded that a confidentiality agreement prevented him from disclosing that information.

While Present did not provide Knapp with the trade confirmations, Present did provide other information regarding the

---

anything from the price of a commodity to a large and diverse collection of securities."  James Chen, Exchange-Traded Fund (ETF): What It Is and How To Invest, Investopedia, https://www.investopedia.com/terms/e/etf.asp [https://perma.cc/9PAS-U99V] (last updated May 23, 2024).

origin, methodology, and performance of the AlphaSector strategy. First, Present provided Knapp with "a spreadsheet that showed all of the 'trades' conducted" based on the AlphaSector strategy from 2001 to 2008.  Second, Present emailed Knapp a letter from index performance calculation firm NASDAQ OMX Group, Inc. ("NASDAQ"). The letter explained that, in September 2008, NASDAQ "began the process of converting [the AlphaSector] live investment strategy to a daily valued, public index"[4] named the "AlphaSector Rotation Index."   On October 13, 2008, NASDAQ "began publishing and disseminating the [AlphaSector Rotation] Index value[s] on a daily basis."  The letter noted that NASDAQ had calculated those values based on data provided by F-Squared, which F-Squared had "indicated to represent live[] . . . investment decisions."  NASDAQ, however, did not disseminate any AlphaSector Rotation "Index values prior to October 13, 2008."

Notwithstanding the spreadsheet and NASDAQ letter, Knapp later testified that Present "could[] [not] produce anything to" verify his claim that the AlphaSector strategy had been used to manage real client accounts and trade actual assets from 2001 to 2008.  Furthermore, Knapp and Arjen Kuyper ("Kuyper"), NAI's President, testified that because NASDAQ did not disseminate any AlphaSector Rotation Index values prior to 2008, NASDAQ could not

---

[4]  As relevant to this action, an index reflects the performance track record of an investment strategy.

verify the AlphaSector strategy's performance figures prior to 2008.

On October 5, 2009, Knapp prepared an executive summary of his due diligence on the AlphaSector strategy.  There, Knapp stated that "[t]he AlphaSector trading system was originally developed and used by a large wealth management group" and that "[t]here is a confidentiality agreement that prevents [F-Squared] from divulging who they are."  Knapp further stated that F-Squared "flat out [would not] show the math to" him, "which would knock [F-Squared] out of contention but for" the fact that "[F-Squared] began reporting the holdings/trades to NASDAQ, which . . . used the data to calculate and publish [the AlphaSector Rotation Index's] performance[] since October 2008."  This, according to Knapp, "add[ed] to the legitimacy of the analytical system."

Shortly thereafter, Knapp met with Navellier and discussed his executive summary with him.  Knapp later testified that, during this meeting, "[i]t would have come up that [Knapp] couldn't verify" the AlphaSector strategy's performance figures from 2001 to 2008.  Knapp recommended to Navellier that NAI license the AlphaSector strategy from F-Squared.  Navellier agreed.

On or around October 19, 2009, NAI and F-Squared entered into a Model Manager Agreement whereby NAI licensed the AlphaSector strategy from F-Squared.  Pursuant to the agreement, F-Squared would periodically send NAI trading signals indicating which ETFs

to purchase and which to sell based on the AlphaSector strategy. NAI rebranded the strategy and offered it to its clients under NAI's new, separate "Vireo AlphaSector" brand.

### 3. Internal Communications

On April 6, 2011, Navellier emailed NAI employees, expressing concern over the lack of support for the AlphaSector strategy's performance track record. Navellier wrote:

> What is so frustrating about [F-Squared] and Vireo is the ongoing lies. . . . I was told the numbers were GIPS[5] verified. Lie . . . . I was told that we had all the trade confirm[ations]. Lie . . . . I am now told that we just have a spreadsheet. Any idiot can make up numbers on a spreadsheet! . . . Obviously, I have to distance myself from [F-Squared] when it blows up and am still trying to figure out how to reduce [NAI's] liability, since when the lies become evident, we are out of business . . . .

Knapp responded, emailing Navellier "the [e]xecutive [s]ummary [that Knapp] prepared that ha[d] the representations made to [Navellier] regarding F-Squared." Later that day, Navellier emailed Knapp, writing:

> I went to get the [trade] confirm[ations] yesterday to see the [wealth management] firm that built the record and I was told that there were no [trade] confirm[ations], just a spreadsheet. I was shocked. Any idiot can send in a bogus spreadsheet! That is not due diligence, that is stupidity. . . . We have always been transparent to consulting groups, but now we suddenly smell like rotting fish! . . . [Present] is not

---

[5] "GIPS" are the Global Investment Performance Standards.

> transparent . . . .  I have no idea how to
> avoid liability on this fiasco.  At least no
> one has lost money yet, but come the next
> market downturn, we could be out of business.

Navellier then emailed Kuyper, stating that "[t]he SEC [was] going to love this."  The next week, on April 12, 2011, Navellier emailed NAI employee Jane Hunt ("Hunt") and instructed her to "take 'Navellier' off of as many [Vireo AlphaSector] documents [as she could], such as Advisory Agreements, the Web Site, etc."

The following month, Navellier again emailed NAI employees, stating that "[u]nless somebody show[ed] [him] the [trade] confirm[ations], [F-Squared] [was] merely a model and [Navellier would] protect[ NAI] from potential fraud, so [NAI employees] must not talk about [F-Squared] as being base[d] on real [money] since 2001."  Navellier, however, stated that he would not stop Vireo AlphaSector sales and would direct "tough questions" to Knapp.

On August 11, 2011, in another email to NAI employees, Navellier stated that the "[F-Squared system] . . . continue[d] to smell like pure FRAUD" and that he could not explain "why [Present was] clueless about basic statistics."  Navellier further stated that while "Vireo was a good idea," NAI "sold the wrong product that continues to smell like FRAUD."  Navellier suggested that, in light of the situation, NAI could "try to sell" the Vireo

AlphaSector business.  On August 25, 2011, Navellier emailed John

Ranft ("Ranft"), NAI's Director of Marketing, stating:

> After Vireo is sold, you can run wild and do
> whatever you want, but I am not going to be
> convicted for fraud, so we need some serious
> disclosure[s] . . . .   Having  indices  that
> cannot be found or daily pricing smells to
> high heaven.  So until [F-Squared] can be
> transparent and . . . allow the validation of
> their claims, I will continue to believe that
> the  original  Alpha  Sector  Premium
> Model . . . is just made up and pure FRAUD.

### 4. Marketing Materials

Meanwhile, NAI distributed NAI-created Vireo AlphaSector

marketing materials to current and prospective clients.  From

August 2011 to November 2011, NAI distributed Vireo AlphaSector

presentations that stated that the AlphaSector strategy had an

inception date of April 1, 2001 (defined as the date in which

"[l]ive assets began tracking" the strategy), described the

AlphaSector strategy as an "active" one, and noted that the

strategy's returns, going back to 2001, were "not back-tested."

In 2012, NAI continued to distribute Vireo AlphaSector

marketing materials containing these statements.  For example, in

March 2012, NAI sent a Vireo AlphaSector presentation to a Wells

Fargo Advisors ("WFA") representative.  At the time, WFA advertised

the Vireo AlphaSector strategy to its clients.  The presentation

still stated that "[l]ive assets began tracking" the AlphaSector

strategy on April 1, 2001.   In June 2012, NAI sent Vireo

AlphaSector "commentary" to another WFA representative.  The
commentary again described the AlphaSector strategy as an "active"
one with an inception date of April 1, 2001, and stated that the
strategy's returns, going back to 2001, were not back-tested.  WFA
provided its clients with these marketing materials.

### 5. Sale of the Vireo AlphaSector Business to F-Squared

On March 15, 2013, NAI and F-Squared executed a letter
of intent setting forth the terms of F-Squared's proposed offer to
purchase NAI's "Vireo strategies and associated client accounts."
According to the letter, the purchase price would be $14 million,
"payable in cash at closing, assuming [that there were] at least
$1.1 billion in revenue generating client assets transfers at [the]
time of closing."

On April 20, 2013, Navellier emailed NAI employees and
notified them of the impending sale of the Vireo AlphaSector
business to F-Squared.  In the email, Navellier stated that "[t]he
catalyst for the [sale] . . . [was] that F-Squared refuse[d] to
stop circulating its fake 10+ year [AlphaSector] indices before
the ETFs actually commenced on May 10, 2007."  Navellier further
stated that NAI was "tipped off to F-Squared's fraud by an ex-SEC
enforcement officer, so [NAI] ha[d] no other choice other than to
clean up th[e] mess" in light of the "obvious fraud."  Navellier
described the situation as "a massive due diligence failure" and
noted that NAI was at risk of a $225,000 fine "for creating indices

before the actual securities existed, due to F-Squared flooding the broker/advisor market with its fake 10+ year performance record" that "[could not] be documented."

On August 7, 2013, NAI and F-Squared entered into an Assignment and Asset Purchase Agreement whereby NAI agreed to sell the Vireo AlphaSector business to F-Squared for $14 million. The next day, NAI sent a letter to its clients announcing that NAI and F-Squared had entered into an agreement whereby F-Squared "plan[ned] to purchase from [NAI] the client accounts and associated investment advisory agreements invested within the Vireo[] AlphaSector[] suite of strategies." The letter stated that, upon completion of the sale, "there should be no material change in investment decision-making or investment objectives of client accounts." The letter went further, stating that "the only material change for clients [would be] that the strategy names [would] change from the Vireo AlphaSector strategies to the F-Squared AlphaSector strategies." The letter did not indicate any reason for the sale.

In September 2013, NAI sold the Vireo AlphaSector business to F-Squared for $14 million. Almost all Vireo AlphaSector clients consented to the sale and continued investing in the AlphaSector strategy with F-Squared. Appellants do not dispute that at no time before or after the sale did they inform their clients of the reason for the sale or of Appellants' lack of

support for the statements in their Vireo AlphaSector marketing
materials.

### 6. SEC Investigation

In or around October 2013, the SEC began investigating
F-Squared.  As part of that investigation, the SEC served
investigative subpoenas on NAI and other investment advisory firms
that had licensed or marketed AlphaSector products.  In December
2014, the SEC brought an enforcement action against F-Squared,
which later settled.  The SEC also brought a civil action against
Present, which did not settle.  The SEC litigated its case against
Present, won a jury verdict, and obtained an injunction against
Present.

The SEC brought enforcement actions against twenty other
investment advisers, including NAI and Navellier, in connection
with the dissemination of marketing materials relating to the
AlphaSector strategy.  Of those investment advisers, only NAI and
Navellier did not settle with the SEC.

### C. Procedural Background

On August 31, 2017, the SEC brought suit against
Appellants in the United States District Court for the District of
Massachusetts.  Count I alleged that Appellants had violated
section 206(1) of the Advisers Act by making "materially false and
misleading statements and omissions to their investment advisory
clients" and engaging "in a scheme to defraud those clients by

concealing material information regarding the performance track record of the investment strategies they offered." Count II alleged that Appellants had similarly violated section 206(2) of the Advisers Act. Count III alleged that, in the alternative, Navellier had aided and abetted NAI's violations of sections 206(1) and 206(2) of the Advisers Act. Finally, Count IV alleged that NAI violated section 206(4)[6] of the Advisers Act. The SEC sought permanent injunctions, disgorgement, and civil monetary penalties against Appellants. Appellants answered the SEC's complaint, denying the allegations therein and asserting affirmative defenses, including a selective enforcement defense.

On August 12, 2019, the SEC moved for partial summary judgment on Count I, Count II, and Appellants' selective enforcement defense. Appellants cross-moved for summary judgment on all counts and on their selective enforcement defense.

On February 13, 2020, after holding a hearing on the motions, the district court denied Appellants' motion for summary judgment and granted the SEC's partial motion for summary judgment as to Count I, Count II, and Appellants' selective enforcement defense. As to Counts I and II, the district court concluded that Appellants had violated sections 206(1) and 206(2) of the Advisers

_____

[6] Section 206(4) of the Advisers Act makes it unlawful for an investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4).

Act.  As to Appellants' selective enforcement defense, the district court first determined that Appellants alleged two types of equal protection claims: a claim of selective enforcement and a class of one claim.  The district court then concluded that both claims failed.[7]

On March 12, 2020, Appellants moved the district court to reconsider its grant of partial summary judgment in favor of the SEC.  The district court denied Appellants' motion for reconsideration.

On June 2, 2020, the district court entered its final judgment.  Therein, the district court (1) permanently enjoined Appellants from violating sections 206(1) and 206(2) of the Advisers Act; (2) held Appellants jointly and severally liable for disgorgement in the amount of $28,964,571 plus prejudgment interest of $6,513,619; and (3) ordered NAI and Navellier to respectively pay civil penalties of $2 million and $500,000.  On June 12, 2020, the SEC instituted administrative proceedings against Appellants.  Appellants timely appealed from the district court's grant of partial summary judgment in favor of the SEC, denial of reconsideration, and final judgment.

---

[7]  On March 25, 2020, the SEC moved to dismiss, with Appellants' consent, Counts III and IV.  The district court granted the motion.  Counts III and IV are not at issue here.

On June 22, 2020, the Supreme Court decided Liu v. SEC, 591 U.S. 71 (2020).  There, the Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under" the Securities Exchange Act of 1934 ("Exchange Act").[8]  Id. at 75.  The Court also instructed district courts to "deduct legitimate expenses before ordering disgorgement."  Id. at 91-92.

On August 20, 2020, we granted the SEC's motion for a limited remand to allow the district court to make additional factual findings and conclusions of law regarding the disgorgement award in light of Liu.  On September 21, 2021, the district court entered its amended final judgment, lowering the disgorgement amount to $22,734,487 with prejudgment interest of $6,635,403, along with amended disgorgement findings of fact and conclusions of law.  Appellants timely appealed from the district court's amended final judgment.

On October 13, 2021, Appellants moved to stay enforcement of the amended final judgment pending their appeals (and to thus stay the SEC's administrative proceedings) and to reduce the supersedeas bond.  On October 19, 2021, Appellants moved the district court to alter or amend its amended final judgment.  On September 13, 2022, the district court denied both motions.

---

[8] Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a-78rr).

Appellants timely appealed from the district court's denial of both motions.

On October 7, 2022, Appellants renewed their motion to reduce the supersedeas bond, which the district court again denied. Appellants timely appealed from the district court's denial of their renewed motion to reduce the supersedeas bond.

On November 22, 2022, Appellants moved this court to stay the SEC's administrative proceedings pending their appeals. We denied the motion on December 23, 2022. On August 7, 2023, we consolidated the four appeals.

## II. DISCUSSION

### A. Sections 206(1) and 206(2) of the Advisers Act

We begin with Appellants' challenge to the district court's grant of summary judgment in favor of the SEC as to Counts I and II. To the extent Appellants also appeal the district court's denial of their cross-motion for summary judgment on the same claims, we address those arguments as well.

We review the district court's grant of summary judgment de novo. Ferrari v. Vitamin Shoppe Indus. LLC, 70 F.4th 64, 69 (1st Cir. 2023). In conducting this review, we construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. Id. We need not, however, "credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Dixon-Tribou v. McDonough, 86 F.4th

453, 458 (1st Cir. 2023) (quoting <u>Lahens</u> v. <u>AT&T Mobility P.R.,</u>
<u>Inc.</u>, 28 F.4th 325, 333 (1st Cir. 2022)).

Summary judgment is proper "if the movant shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
This standard "remains the same when the district court is faced
with cross-motions for summary judgment." <u>Dixon-Tribou</u>, 86 F.4th
at 458. We "may affirm a district court decision on any ground
supported by the record." <u>P.R. Ports Auth.</u> v. <u>Umpierre-Solares</u>,
456 F.3d 220, 224 (1st Cir. 2006).

Section 206(1) of the Advisers Act makes it unlawful for
an investment adviser "to employ any device, scheme, or artifice
to defraud any client or prospective client." 15 U.S.C.
§ 80b-6(1). Section 206(2) prohibits an investment adviser from
"engag[ing] in any transaction, practice, or course of business
which operates as a fraud or deceit upon any client or prospective
client." 15 U.S.C. § 80b-6(2). To establish a violation, "each
of these sections requires the SEC to show the investment adviser
made a material misrepresentation with a culpable mental state."
<u>ZPR Inv. Mgmt. Inc.</u> v. <u>SEC</u>, 861 F.3d 1239, 1247 (11th Cir. 2017).
We address each element in turn.

## 1. Misrepresentations

Appellants do not dispute that their Vireo AlphaSector
marketing materials stated that the AlphaSector strategy had an

inception date of April 1, 2001, that the strategy was an "active" one, and that the strategy's returns were not back-tested.[9] Appellants, however, contend that the SEC did not prove that these statements were false.

The Supreme Court has emphasized that "[t]o impose upon the [SEC] the burden of showing deliberate dishonesty as a condition precedent to protecting investors through the prophylaxis of disclosure would effectively nullify the protective purposes of the statute." Cap. Gains, 375 U.S. at 200. Consistent with this, we have made clear that section 206 "includes an obligation to provide 'full and fair disclosure of all material facts' to investors" and "to employ reasonable care to avoid misleading" current and prospective clients. SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) (quoting Cap. Gains, 375 U.S. at 194). It follows that section 206 "prohibits failures to disclose material information, not just affirmative frauds." SEC v. Wash. Inv. Network, 475 F.3d 392, 404 (D.C. Cir. 2007).

---

[9] After Appellants conceded having made these statements in their opening brief, Appellants argued, for the first time in their reply brief, that what "NAI actually said and did was to provide a two-page performance chart and disclosure stating correctly that its Vireo AlphaSector Premium live-traded strategy began in '2010' and provided its live-traded performance track record of a 13.18% increase through December 31, 2010." The record, however, confirms that Appellants made the relevant statements, and Appellants have waived any argument to the contrary. See United States v. Evans-Garcia, 322 F.3d 110, 114 (1st Cir. 2003) ("Arguments raised for the first time in reply briefs are generally deemed waived.").

Here, the undisputed facts establish that the relevant statements were false and therefore misrepresentations within the scope of section 206.  As early as October 2009, Knapp knew that Present would not disclose the trade confirmations that would verify his claims about the AlphaSector strategy's performance figures from 2001 to 2008.  Navellier was similarly on notice that F-Squared "flat out [would not] show the math to" Knapp.  Indeed, F-Squared later admitted in an administrative proceeding that it "did not create AlphaSector until late 2008" and that the claim that the AlphaSector strategy "had been used to manage client assets from April 2001 to September 2008" was "materially false."  And, in 2017, a jury found that Present's misrepresentations as to the history of the AlphaSector strategy violated the Advisers Act.  See SEC v. Present, No. 14-cv-14692, 2018 WL 1701972, at *1 (D. Mass. Mar. 20, 2018).

From April 2011 to August 2011, in a series of internal emails with NAI employees,[10] Navellier expressed concern over

---

[10] Appellants contend that the district court "impermissibly did not consider" the context of Navellier's internal emails with NAI employees.  According to Appellants, these "internal email accusations were unsupported fabrications, made by [Navellier] in an effort to coerce and scare NAI's marketers to stop marketing Vireo, and focus instead on marketing [Navellier's] personally created investment strategies."  Appellants thus argue that the emails were a product of Navellier's "jealous[y] of Howard Present and his success."  The record, however, which evidences Appellants' lack of support for the relevant statements, belies Appellants' post hoc rationalization of these emails.  Appellants' characterization of the emails is thus insufficient to create a

having "no [trade] confirm[ations], just a spreadsheet," to support Present's claims about the AlphaSector strategy and its performance.  More than once, Navellier acknowledged the liability that could stem from NAI's lack of support for these claims.  Navellier emphasized that the Vireo AlphaSector business "smell[ed] like FRAUD, especially since no one [could] find" trade confirmations for the AlphaSector strategy's performance.  Navellier even warned NAI employees "not [to] talk about [the AlphaSector strategy] as being base[d] on real [money] since 2001."

Nevertheless, from 2011 to 2012, NAI created and distributed Vireo AlphaSector marketing materials that restated Present's false claims.  Specifically, the marketing materials claimed that the AlphaSector strategy had an inception date of April 1, 2001, that the strategy was an "active" one, and that the strategy's performance figures, all the way back to 2001, were "not back-tested."  NAI, however, remained unable to corroborate these statements.  Indeed, in their answer to the SEC's complaint, Appellants admitted that they "lack[ed] knowledge or information sufficient to admit or deny . . . that [the] statements" in their Vireo AlphaSector marketing materials were false.

---

genuine issue of material fact.  See Triangle Trading Co. v. Robroy Indus., 200 F.3d 1, 2 (1st Cir. 1999) ("Conclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact.") (internal quotation marks and alteration omitted).

Instead of modifying or stopping the distribution of the relevant statements, Navellier ordered Hunt to "take 'Navellier' off of as many [Vireo AlphaSector] documents [as she could], such as Advisory Agreements, the Web Site, etc."  Instead of halting Vireo AlphaSector sales, Navellier declared that he would "not stop[] Vireo sales" and would direct "tough questions to [Knapp]."  Instead of informing clients of the lack of support for the statements, Navellier sold the Vireo AlphaSector business to F-Squared and told clients that "there should be no material change in investment decision-making or investment objectives of client accounts."

Appellants' argument that they presented "evidence that the statement[s] [were] true" fails to raise a genuine dispute of material fact as to the statements' veracity.[11]  First, Appellants point to Morton's assurances to Present that he began applying the sector rotation strategy to actual assets in April 2001.  But while the assurances Appellants received about the AlphaSector strategy may be relevant to what Appellants knew about the strategy's performance, they do not actually prove the strategy had been live

---

[11] The Supreme Court rejected a similar argument in Capital Gains, which interpreted the reach of section 206.  375 U.S. at 200.  There, the respondents argued that "their advice was 'honest' in the sense that they believed it was sound."  Id.  The Court characterized this argument as "another way of putting the rejected argument that the elements of technical common-law fraud -- particularly intent -- must be established before an injunction requiring disclosure may be ordered."  Id.

traded since 2001.  Second, Appellants contend that the NASDAQ letter "reasonably confirmed" that the AlphaSector strategy had been used to manage real assets since 2001.  The letter, however, states only that NASDAQ "calculated historical values of the Index back to the inception date as defined by F-Squared," and that NASDAQ relied upon data provided by F-Squared, which F-Squared "indicated to represent live[] . . . investment decisions."  NASDAQ itself never independently verified the claim that the AlphaSector strategy had been live traded since 2001.  Indeed, Knapp and Kuyper testified that, even with the NASDAQ letter, NAI remained unable to verify the strategy's performance figures prior to 2008. Appellants' inability to point to any direct evidence supporting their claims as to the AlphaSector strategy -- evidence they have every incentive to produce in this litigation -- is telling.

For the foregoing reasons, we conclude that there remains no genuine dispute of material fact as to whether the relevant statements were misrepresentations within the scope of sections 206(1) and 206(2) of the Advisers Act.

### 2. Materiality

Next, Appellants argue that either the relevant statements were not material or that materiality is a question for the jury that cannot be resolved on a motion for summary judgment. Appellants rely on (1) an SEC witness's testimony that "for purposes of coming to [a] settlement[,]" "the older [a] track

record gets, the less important it is"; (2) an investment adviser's testimony that, when advising clients to invest in Vireo AlphaSector strategies, he "[f]ocused on how [the strategies] would behave going forward" and "[did not] care about [back-testing]"; and (3) Ranft's testimony that "[i]t was [his] understanding . . . that the reason [investors] remained NAI Vireo clients was the actual performance they received."

Appellants misconstrue the materiality requirement. Omissions are material "if there is a substantial likelihood that a reasonable investor would consider [them] important in" making an investment decision. SEC v. Fife, 311 F.3d 1, 9 (1st Cir. 2002) (emphasis added) (citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)). The standard for materiality is thus not actual reliance and "the SEC [is] not required to prove that any investor actually relied on [Appellants'] misrepresentations." SEC v. World Tree Fin., L.L.C., 43 F.4th 448, 465 (5th Cir. 2022); Wash. Inv. Network, 475 F.3d at 405 ("To obtain an injunction under section 206 against fraudulent conduct, the SEC does not need to prove reliance on the investment adviser's misleading statements, nor does the SEC need to prove injury." (citing Cap. Gains, 375 U.S. at 192-93, 195)). If the "established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality[,]' . . . the ultimate issue of materiality [is] appropriately resolved 'as a matter of law' by

summary judgment." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970)). Such is the case here.

The established omissions here are obviously important to an investor because whether the AlphaSector strategy's performance figures are back-tested or based on actual trades speaks to the potential risk that an investor will take if they decide to invest in the strategy. As opposed to active strategies and performance figures generated by actual trades, back-testing generates only hypothetical performance figures, benefits from hindsight, and involves "the corresponding ability to manipulate [data] to obtain attractive returns." A reasonable investor, in deciding whether to invest in the Vireo AlphaSector strategy, would thus consider Appellants' omissions, that they were unable to corroborate that the strategy was an "active" one and its performance returns not back-tested, obviously important. The disclosure of these omissions "would obviously change the perceived" risk of investing in the strategy "to a reasonable investor." See SEC v. Bauer, 723 F.3d 758, 773 (7th Cir. 2013). In other words, the "omissions were material because a reasonable investor would want to know the risks involved" in their investment. Fife, 311 F.3d at 10.

Neither does any of Appellants' proffered evidence raise a genuine question of fact as to the materiality of the

misstatements.  The SEC witness's testimony speaks only to how the SEC itself weighs misstatements about an investment strategy's track record when formulating a proposed settlement offer, and not how investors would use the same information when making an investment decision.  Similarly, Ranft's testimony goes only to whether the misstatements motivated investors to remain NAI Vireo AlphaSector clients, not whether it encouraged them to sign up for Vireo in the first place.  And the investment adviser's testimony describes how he presented the information about Vireo AlphaSector to potential clients, not how those potential clients themselves considered the statements at issue when choosing to put their money in Vireo.

The record provides further support for the conclusion that Appellants' omissions were material as a matter of law. First, on three different occasions prior to NAI's distribution of the relevant statements, OCIE flagged NAI's failure to adequately disclose performance figures as back-tested, explaining and alerting NAI to the importance of this disclosure.  Second, Navellier himself acknowledged the importance of this disclosure not only by repeatedly referencing the liability that could stem from NAI's unsupported claims but also by directing NAI employees "not [to] talk about [F-Squared] as being base[d] on real [money] since 2001."  See SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997)

("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it.").

Because Appellants' omissions "are 'so obviously important to an investor[] that reasonable minds cannot differ on the question of materiality' . . . the ultimate issue of materiality [is] appropriately resolved [here] 'as a matter of law' by summary judgment." TSC Indus., Inc., 426 U.S. at 450 (quoting Johns Hopkins Univ., 422 F.2d at 1129).

### 3. Culpable Mental State

While the misrepresentation and materiality elements are the same for sections 206(1) and 206(2) of the Advisers Act, the requisite mental state differs. See ZPR Inv. Mgmt. Inc., 861 F.3d at 1247. Section 206(1) "requires the SEC to show the adviser acted with scienter." Id. Section 206(2), on the other hand, "require[s] no showing of scienter, and a showing of negligence is sufficient." Id.

### a. Scienter

As to scienter, Appellants argue that summary judgment was improper because a reasonable jury could find that they did

not intend to defraud current or prospective clients.[12]    This
argument fails.

Proving scienter requires "a showing of either conscious
intent to defraud or 'a high degree of recklessness.'" ACA Fin.
Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)
(quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir.
2002)).    "Recklessness is 'a highly unreasonable omission,
involving not merely simple, or even inexcusable [] negligence,
but an extreme departure from the standards of ordinary care, and
which presents a danger of misleading buyers or sellers that is
either known to the defendant or is so obvious the actor must have
been aware of it.'"    Fife, 311 F.3d at 9–10 (alteration in
original) (quoting Greebel v. FTP Software, Inc., 194 F.3d 185,
198 (1st Cir. 1999)).    "As this court has observed, a defendant's
publication of statements when that defendant 'knew facts
suggesting the statements were inaccurate or misleadingly
incomplete is classic evidence of scienter.'"    SEC v. Johnston,

---

[12] Appellants further argue that the district court improperly
considered "NAI's work product/attorney-client privileged
communications" with ACA Compliance Group ("ACA"), a consulting
firm "hired at the behest of NAI's attorney to assist him in
providing legal advice to [Appellants] in anticipation of possible
litigation with the SEC."   Even assuming arguendo that the district
court improperly considered the communications, any such error is
harmless as our de novo review does not rely on the communications.
See Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 512 (1st Cir.
2022).

986 F.3d 63, 74 (1st Cir. 2021) (quoting Aldridge, 284 F.3d at 83).

As per our analysis of the misrepresentation and materiality requirements, Appellants' omissions were not only material but an extreme departure from the standards of ordinary care. Furthermore, as evidenced by OCIE's communications with NAI as well as Navellier's internal emails with NAI employees, the misrepresentations presented a danger of misleading current and prospective clients that was known to Appellants when they distributed the relevant statements. The record thus establishes that Appellants acted with a high degree of recklessness, thus acting with scienter.

### b. Negligence

"[T]he negligence required by [section] 206(2) is a less demanding standard than scienter . . . ." SEC v. Cutter Fin. Grp., LLC, No. 23-cv-10589, 2023 WL 8653927, at *6 (D. Mass. Dec. 14, 2023). Here, the SEC has proved that Appellants were negligent "by failing to 'employ reasonable care to avoid misleading [their] clients.'" SEC v. Duncan, No. 3:19-cv-11735, 2021 WL 4197386, at *15 (D. Mass. Sept. 15, 2021) (quoting Cap. Gains, 375 U.S. at 194).

For the foregoing reasons, we conclude that there remains no genuine dispute of material fact as to any element of the alleged violations of sections 206(1) and 206(2) of the

Advisers Act.  We thus affirm the district court's grant of summary judgment in favor of the SEC as to Counts I and II.

### B. Affirmative Defense

We turn to Appellants' challenge to the district court's grant of summary judgment in favor of the SEC as to Appellants' selective enforcement defense.  The district court determined, and neither party disputes, that Appellants alleged (1) a claim of selective enforcement and (2) a class of one claim.  We take each claim in turn.

### 1. Selective Enforcement

To establish a claim of selective enforcement under the Equal Protection Clause, Appellants must establish that "(1) [they], compared with others similarly situated, [were] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (quoting Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989)).

### a. "Similarly Situated" Element

Appellants argue that they were similarly situated to investment advisory firms WFA and Beaumont Financial Partners ("Beaumont") because both WFA and Beaumont disseminated the

relevant statements to their clients, yet the SEC took no enforcement action against them.  We are unpersuaded.

"[T]he standard 'is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'"  Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 106 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).  "[T]he 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result."  Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004).  While "[e]xact correlation is neither likely nor necessary, . . . the cases must be fair congeners."  Dartmouth, 889 F.2d at 19.

Here, a prudent person, looking objectively at the incidents, would not think them roughly equivalent or the protagonists similarly situated.  In arguing only that WFA and Beaumont disseminated the relevant statements, Appellants ignore the ways in which Appellants' case is unique and differs from WFA and Beaumont's.  For example, Appellants point to only one instance in which WFA and Beaumont each distributed the relevant statements, whereas Appellants repeatedly disseminated the statements from 2011 to 2012 while knowing that they lacked support for them.

Furthermore, Appellants did so even after OCIE had warned them of having made similar misleading statements in the past and informed them that the SEC "views repeat violations as a serious matter and considers recidivist behavior when making a determination on whether to refer matters to the enforcement staff for possible further actions." Appellants, however, have produced absolutely no evidence that this was also the case for WFA and Beaumont, or that, at the very least, these firms had received similar warnings. The cases are not "fair congeners." See id.

Because Appellants fail to establish that they were similarly situated to the comparators they identify, Appellants' selective enforcement claim fails as a matter of law. We need not consider whether the alleged selective treatment was based on impermissible considerations or bad faith. See PDK Lab'ys Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").

### 2. Class of One

To establish a class of one claim, Appellants "must show that they were 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). The "similarly situated" element here

requires "an extremely high degree of similarity between [Appellants] and the [entities] to whom they compare themselves." Id. (quoting Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007)). In light of our previous conclusion, see supra, Appellants have failed to establish a high degree of similarity between WFA, Beaumont, and Appellants. Their class of one claim thus fails as a matter of law.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the SEC as to Appellants' selective enforcement defense.[13]

## C. Disgorgement

We now consider Appellants' challenges to the district court's disgorgement order.

### 1. Availability

Appellants first argue that disgorgement was not an available equitable remedy because NAI's Vireo AlphaSector clients suffered no pecuniary harm. "The availability of an equitable remedy presents a question of law engendering de novo review." In

---

[13] Appellants argue that the district court's denial of reconsideration of its summary judgment ruling "was an abuse of discretion since[] . . . [the district court] failed to follow the law and the fact that there was no evidence the statement[s] [were] false." In light of our reasoning and conclusion above, this argument fails. See Laureano-Quiñones v. Nadal-Carrión, 982 F.3d 846, 849-50 (1st Cir. 2020) (dismissing challenge to the district court's denial of motion for reconsideration when the motion was directed to the underlying substantive issue of summary judgment).

re PHC, Inc. S'holder Litig., 894 F.3d 419, 435 (1st Cir. 2018);

see also SEC v. Sanchez-Diaz, 88 F.4th 81, 87 n.2 (1st Cir. 2023).

To punish securities fraud, Congress authorized federal
courts to grant "any equitable relief that may be appropriate or
necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5);
see also Liu, 591 U.S. at 87-90. Congress explicitly provided for
disgorgement as equitable relief, stating that "[i]n any action or
proceeding brought by the [SEC] under any provision of the
securities laws, the [SEC] may seek, and any [f]ederal court may
order, disgorgement." 15 U.S.C. § 78u(d)(7). Under this
provision, federal courts have jurisdiction to require
disgorgement "of any unjust enrichment by the person who received
such unjust enrichment as a result of" a securities law violation.
15 U.S.C. § 78u(d)(3)(A)(ii).

Appellants' argument that disgorgement was not an
available equitable remedy here because NAI's Vireo AlphaSector
clients did not suffer pecuniary harm mischaracterizes the nature
and purpose of disgorgement.[14] Disgorgement is a "profit-based

---

[14] Appellants cite SEC v. Govil, 86 F.4th 89, 98 (2d Cir. 2023),
for the proposition that, before awarding disgorgement, the
district court was required to find that NAI's clients suffered
pecuniary harm. Govil states that "[a]n investor who suffered no
pecuniary harm as a result of the fraud is not a victim," and thus
disgorgement in such a case would not be "awarded for victims," as
Liu requires. See id. at 98; Liu, 591 U.S. at 74. Neither Liu
nor our case law, however, require investors to suffer pecuniary
harm as a precondition to a disgorgement award. In Liu, the Court
held that a disgorgement award must be awarded for victims, and

measure of unjust enrichment" which reflects the foundational principle that "it would be inequitable that [a wrongdoer] should make a profit out of [their] own wrong." Liu, 591 U.S. at 79-80 (alteration omitted) (first alteration in original). Disgorgement is thus "tethered to a wrongdoer's net unlawful profits." Id. at 80 (emphasis added). Consistent with this understanding, we have recognized the distinction between disgorgement, which is limited to "the amount with interest by which the defendant profited from his wrongdoing," and other forms of equitable relief which may "include[] total losses suffered by the victims." CFTC v. JBW Cap., 812 F.3d 98, 111 (1st Cir. 2016) (quoting SEC v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983) (en banc)). We have similarly emphasized that "[t]he case law holds with conspicuous clarity that when a fiduciary has secured an undue advantage by virtue of his position, equitable relief is available even in the absence of direct economic loss to the complaining party." In re PHC, Inc., 894 F.3d at 436.

---

explained that "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." Liu, 591 U.S. at 74, 89. Here, notwithstanding the fact that Vireo AlphaSector clients profited from their investments, they were induced into paying advisory fees to NAI by Appellants' misrepresentations. And the SEC "intends to distribute to the Vireo AlphaSector clients any disgorgement awarded." Disgorgement here will thus do more than simply benefit the public at large -- it will remedy a direct harm to Vireo AlphaSector clients.

We thus conclude that, "in the circumstances of this case, the equitable remedy of disgorgement was available in principle." Id. at 437.

## 2. Appropriateness

Next, we consider Appellants' challenges to the appropriateness of the district court's disgorgement order. "[T]he decision either to award or to refrain from awarding an available equitable remedy is reviewed for abuse of discretion." Id. at 435. Similarly, we evaluate under an abuse of discretion standard "whether the district court . . . properly tailored the scope of the disgorgement order to address the wrongdoer's conduct." Sanchez-Diaz, 88 F.4th at 87 n.2; see also SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971). We will thus conclude that a district court "abuse[d] its discretion only if we are left with a firm conviction that it has committed 'a meaningful error in judgment.'" Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 323 (1st Cir. 1989) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).

A "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief

permissible" under the Exchange Act. Liu, 591 U.S. at 75. "The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." Id. at 88. "The amount of disgorgement 'need only be a reasonable approximation of profits causally connected to the violation.'" Happ, 392 F.3d at 31 (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)). "Once the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." Id. District courts must "deduct legitimate expenses before ordering disgorgement" so that the disgorgement award does not "exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" Liu, 591 U.S. at 91-92 (quoting Providence Rubber Co. v. Goodyear, 76 U.S. 788, 804 (1869)). "The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." Happ, 392 F.3d at 31.

In its amended final judgment, the district court ordered Appellants jointly and severally liable for disgorgement in the amount of $22,734,487 plus prejudgment interest of $6,635,403. The district court first determined that disgorgement will be for the benefit of investors because the SEC "intends to distribute to the Vireo AlphaSector clients any disgorgement

awarded here."  The district court then noted that there were two types of profit causally connected to Appellants' violations: (1) the advisory fees NAI clients paid for Vireo AlphaSector strategies from 2011 to 2013, when Appellants sold the Vireo AlphaSector business, and (2) the proceeds from such sale.  Based on NAI's income statements, the district court determined that the advisory fees totaled $22,775,867.  The proceeds from the sale of the Vireo AlphaSector business were $14 million.  The district court thus concluded that the total profits causally connected to Appellants' violations equaled $36,775,867.  Consistent with Liu, the district court then deducted $14,041,380 in legitimate expenses from these profits.  This deduction represented research expenses, other non-marketing expenses, and non-marketing salaries.  The district court thus determined the total disgorgement amount to be $22,734,487.

Appellants launch multiple challenges to the district court's disgorgement order.  First, they contend that the district court abused its discretion in ordering Navellier jointly and severally liable with NAI even though Navellier himself did not disseminate the relevant statements and did not directly provide investment advice to NAI's Vireo AlphaSector clients.

This argument is unavailing.  The "imposition of joint and several liability for a disgorgement award is permissible so long as it is 'consistent with equitable principles.'"  SEC v.

Janus Spectrum LLC, 811 F. App'x 432, 433-34 (9th Cir. 2020) (quoting Liu, 591 U.S. at 91).  The district court concluded that joint and several liability was consistent with equitable principles here because Appellants engaged in concerted wrongdoing.  See Liu, 591 U.S. at 90.  In so concluding, the district court considered (1) Navellier's authoritative role in NAI; (2) Navellier's fiduciary duty, as investment adviser, to all of NAI's clients; (3) Navellier's violation of sections 206(1) and 206(2) of the Advisers Act; and (4) that Navellier, as majority owner of NAI, shared in profits received by NAI.  In light of the district court's considerations, the district court did not abuse its discretion in ordering Appellants jointly and severally liable for disgorgement.

Second, Appellants argue that there is no causal connection between the advisory fees paid by NAI's clients for Vireo AlphaSector strategies and Appellants' violations of the Advisers Act.  Specifically, Appellants contend that the SEC did not prove that investors became and remained Vireo AlphaSector clients because of NAI's dissemination of the relevant statements.

This argument likewise fails.  The SEC need only establish that the amount of disgorgement sought is a reasonable approximation of profits causally connected to the violation.  See Happ, 392 F.3d at 31.  And the causal connection requirement does not demand the type of tracing suggested by Appellants.  Indeed,

this requirement "does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of [their] wrongful act." SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset."). Instead, "the causal connection required is between the amount by which the defendant was unjustly enriched and the amount [they] can be required to disgorge." Id.

With this in mind, we find no abuse of discretion in the district court's determination that there is a causal connection between the paid advisory fees and Appellants' violations. The SEC presented evidence that Appellants distributed the relevant, material statements to current and prospective clients, and that those who became Vireo AlphaSector clients paid advisory fees to NAI. From 2011 to 2013, those clients continued to pay advisory fees to NAI while Appellants continued to conceal their lack of support for the relevant statements. Once the burden shifted to Appellants, Appellants failed to demonstrate that any of the advisory fees paid to them were unconnected to the Vireo AlphaSector strategies.

Appellants' related argument that there is no causal connection between the proceeds from the sale of the Vireo AlphaSector business and Appellants' violations fails for similar

reasons. According to the letter of intent between NAI and
F-Squared, the sale price would be $14 million "assuming [that
there were] at least $1.1 billion in revenue generating client
assets transfers at [the] time of closing." The sale price was
therefore dependent on the number of Vireo AlphaSector clients who
transferred their assets to F-Squared. The district court
concluded, and Appellants do not dispute, that Appellants thus
"had a substantial incentive not to disclose their
misrepresentations and the reason they were selling the business."
And, indeed, Appellants did not disclose them. At the time of the
sale, almost all Vireo AlphaSector clients transferred their
assets to F-Squared, and the sale price was, in fact, $14 million.
In light of this, the district court did not abuse its discretion
in concluding that Appellants' profits from the sale of the Vireo
AlphaSector Business are causally connected to their violations.

Third, Appellants argue that disgorgement must be
limited to only two of the Vireo AlphaSector strategies they sold
because some Vireo AlphaSector marketing materials for the other
strategies did not contain the relevant statements. Not so.
Contrary to Appellants' assertion, the record shows that the
distributed relevant statements applied to all of their Vireo
AlphaSector strategies. For example, Appellants' marketing
materials claimed that "[l]ive assets began tracking the
[AlphaSector] strategies" on April 1, 2001, and that "the Indexes

are based on active strategies." That Appellants distributed marketing materials that did not contain these statements does not change the fact that these statements, which apply to all Vireo AlphaSector strategies, may have induced investors to buy any of the offered strategies.[15]

For the foregoing reasons, we find no abuse of discretion in the district court's disgorgement order,[16] and affirm the district court's amended final judgment.[17]

---

[15] Appellants also argue that they were entitled to a deduction of legitimate expenses in the amount of $8,303,849, and a deduction of the profits they provided to their clients as part of the Vireo AlphaSector business. Appellants, however, fail to explain how their $8,303,849 figure and the investment profits returned to their clients, which their clients were entitled to, represent legitimate expenses that had "value independent of fueling a fraudulent scheme." Liu, 591 U.S. at 92; see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Similarly, Appellants assert, in both their opening and reply briefs, that they repaid their Vireo AlphaSector clients all advisory fees in addition to returning the Vireo AlphaSector profits. At no point, however, do Appellants provide support for this assertion. See Zannino, 895 F.2d at 17.

[16] Appellants conclusorily assert that the ten-year statute of limitations Congress enacted in 2021 governing claims under section 206(1) is unconstitutionally retroactive. See William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625-26 (codified at 15 U.S.C. § 78u(d)(8)). This argument is waived. See Zannino, 895 F.2d at 17.

[17] Our conclusion disposes of Appellants' claims that the district court abused its discretion in ordering Appellants to pay prejudgment interest and civil penalties, and in declining to alter

### D. Supersedeas Bond[18]

Appellants argue that the amount of the supersedeas bond should be reduced to no more than $1.5 million.  "The nature and the amount of [a supersedeas] bond is entrusted to the discretion of the trial court." Acevedo-García v. Vera-Monroig, 296 F.3d 13, 17 (1st Cir. 2002).

Under Local Rule 62.2, "[a] bond or other security staying execution of a money judgment shall be in the amount of the judgment plus 10% of the amount."  LR, D. Mass. 62.2.  Here, that is approximately $33 million.  In deciding whether to reduce this amount, district courts may consider "whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position." Cognitive Edge Pte Ltd. v. Code Genesys, LLC, No. 1:19-cv-12123, 2021 WL 4477434, at *5 (D. Mass. Sept. 30, 2021) (quoting In re Nassau Cnty. Strip Search Cases, 783 F.3d 414, 417-18 (2d Cir. 2015)).

Appellants argue that the supersedeas bond should be reduced to no more than $1.5 million because "neither NAI [n]or

---

or amend its amended final judgment, both of which are based on Appellants' challenges to the disgorgement order.

[18] Appellants again ask us to stay the SEC's administrative proceedings.  We have already considered Appellants' arguments and deny the request for the reasons stated in our December 23, 2022, order.

[Navellier] have the assets or financial capability to obtain" a higher supersedeas bond.  Appellants also argue that Navellier and his wife hold real estate, personal property, and financial accounts as tenants by the entirety, and that Navellier's wife "is not a judgment debtor in this case and does not consent to hav[ing] their . . . assets available to satisfy" Appellants' debts.

The district court rejected these arguments.  In doing so, the district court considered Appellants' financial report and concluded that the report did not "warrant the [district court's] exercise of discretion" to reduce the supersedeas bond, "particularly where [the] amount [of $1.5 million] represents less than 5% of the $33 million bond that would otherwise be required." As to Navellier's assets, the district court noted that "[w]hether all such assets would be reachable by judgment in this case is different [from] whether [those assets] could be collateral for a bond that exceeds the [$1.5] million" Appellants seek.  In light of the district court's considerations, we find no abuse of discretion in its decision not to reduce the amount of the supersedeas bond.

### III. CONCLUSION

The district court's judgments in these consolidated appeals are **<u>affirmed</u>**.